WESTLANDS WATER DISTRICT, San
Luis & Delta–Mendota Water Author-
ity, and San Benito County Water Dis-
trict, Plaintiffs,

Sacramento Municipal Utility District,
Plaintiff–Intervenor,

Northern California Power Association,
Plaintiff–Intervenor

v.

UNITED STATES DEPARTMENT
OF the INTERIOR, et al.,
Defendants,

Hoopa Valley Tribe, Defendant–
Intervenor,

Yurok Tribe, Defendant–Intervenor.

No. CIV.F–00–7124 OWW DLB.

United States District Court,
E.D. California.

Dec. 10, 2002.

Daniel J O'Hanlon, Kronick, Moskovitz, Tiedemann and Girard, Sacramento, CA, for Westalnds Water District, San Luis & Delta Mendota Water Authority and San Benito County Water District.

Steve Saxton, David Lindgren, Sacramento, CA, for Sacramento Municipal Utility District.

T. Ronald Lapheimer, for Northern California Power Association.

Charles Shockey, United States Department of Justice, Environment and Natural Resources Div, Sacramento, CA, for United States Department of the Interior and all other named Federal defendants.

Thomas P Schlosser, Morisset Schlosser Ayer and Jozwiak, Seattle, WA, for The Hoopa Valley Tribe.

Scott W Williams, Law Offices of Scott W Williams/Mary Louise Frampton, Berkeley, CA, for The Yurok Tribe.

MEMORANDUM DECISION AND ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT (DOCS. 233, 238, 243, 247, 252)

WANGER, District Judge.

Before the court are cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was heard August 20, 2002.

Plaintiffs Westlands Water District, San Luis & Delta Mendota Water Authority and San Benito County Water District were represented by Daniel O'Hanlon, Esq. Plaintiff Intervenor, Sacramento Municipal Utility District, was represented by Steve Saxton, Esq., and David Lindgren, Esq. Northern California Power Association, Plaintiff Intervenor, was represented by T. Ronald Lapheimer, Esq. Defendant United States Department of the Interior and all other named Federal defendants,[1] were represented by Charles Shockey, Esq. The Hoopa Valley Tribe, Defendant–Intervenor, was represented by Thomas Schlosser, Esq. The Yurok Tribe was represented by Scott Williams, Esq.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This suit involves the United States Department of Interior's ("Interior") administration of the Trinity River Division ("TRD")[2] of the Central Valley Project ("CVP") and Interior's implementation of Section 3406(b)(23)[3] of the Central Valley

1. The "federal defendants" include: The Department of the Interior; the Secretary of the Department of the Interior; the Bureau of Reclamation; the Commissioner of the Bureau of Reclamation; the Regional Director of the Mid–Pacific Region of the Bureau of Reclamation; the U.S. Fish and Wildlife Service; the Director of the Fish and Wildlife Service; the Operations Manager of the California/Nevada Operations Office of the Fish and Wildlife Service; the Department of Commerce; the Secretary of the Department of Commerce; the Assistant Administrator for Fisheries of the U.S. National Marine Fisheries Service; and the Regional Administrator for the Southwest Region of the U.S. National Marine Fisheries Service.

2. The TRD consists of: the Trinity and Lewiston dams and their reservoirs; Trinity and Lewiston powerplants; Clear Creek tunnel; Judge Francis Carr powerhouse; Whiskeytown dam and lake; Spring Creek tunnel and powerplant; Spring Creek debris dam and reservoir; and related pumping and distribution facilities.

3. CVPIA §§ 3406(b) and (b)(23) read:

The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. § 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. The Secretary, in consultation with other State and Federal agencies, Indian tribes, and affected interests, is further authorized and directed to:

. . .

(23) in order to meet Federal trust responsibilities to protect the fishery resources of the Hoopa Valley Tribe, and to meet the fishery restoration goals of the Act of October 24, 1984, Public Law 98–541, provide

Project Improvement Act ("CVPIA"),[4] to restore and maintain the Trinity River fishery.

## II. UNDISPUTED FACTS

The TRD was authorized by an Act of Congress on August 12, 1955.[5] Among the purposes of the TRD Act are that the Secretary provide necessary and beneficial services such as water supply and power and that the Secretary operate the TRD to effectuate the fullest, most beneficial and most economic utilization of the River and adopt appropriate measures to protect fish and wildlife in the Trinity River basin. Trinity River Act of 1955 § 2. Construction of the TRD was completed and operations commenced in 1964. The TRD transfers water from the Klamath River Basin, which includes the Trinity River, in

Trinity County, California, to the Sacramento River Basin. Its primary function is to store Trinity River water for regulated diversion to California's Central Valley for agricultural, municipal, and industrial uses. It also produces electrical power. The TRD accounts for twenty-five percent (25%) (500 megawatts (Mw)) of the 2000 Mw of CVP-generated electric power.

The Trinity River Basin is home to protected fish species:

> The native anadromous salmonid species of interest in the mainstem Trinity River and its tributaries include chinook salmon, coho salmon, and steelhead. Of the three species, there are two spawning populations of chinook salmon (spring and fall) and two spawning populations of steelhead (winter and summer). All anadromous species begin their life in

through the Trinity River Division, for water years 1992 through 1996, an instream release of water to the Trinity River of not less than three hundred and forty thousand acre-feet per year for the purposes of fishery restoration, propagation, and maintenance and,

(A) by September 30, 1996, the Secretary, after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study currently being conducted by the United States Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981, in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery; and

(B) not later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant

Marine and Fisheries of the House of Representatives. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly. If the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe. Costs associated with implementation of this paragraph shall be reimbursable as operation and maintenance expenditures pursuant to existing law.

Central Valley Project Improvement Act, Pub.L. No. 102–575, § 3406(b)(23), 106 Stat. 4600, at 4720–21.

4. Pub.L. No. 102–575, § 3401–12, 106 Stat. 4600, 4706 (Oct. 30, 1992).

5. Pub.L. No. 84–386 (August 12, 1955).

fresh water, then migrate to the ocean to mature, and return to spawn in fresh water.

DEIS at 3–151 to 3–152. The spring-run chinook migrates in the spring to summer, spawns in the early fall, rears in winter-spring-summer, and makes its habitat for feeding in shallow, slow-moving waters adjacent to higher water velocities. The fall-run chinook migrates in the fall, spawns in the fall, rears in winter-spring-summer, and makes its habitat in the same areas as the spring-run chinook. The winter steelhead migrates in the fall to winter, spawns between February and April, rears year-round, and makes its habitat in areas of clean cobble where there is refuge from high river flow velocities. The summer steelhead migrates in the spring to summer, spawns between February and April, rears year-round, and makes its habitat in the same area as its related species.

The Hoopa Valley and Yurok Reservations were established in those Tribes' aboriginal lands in the Klamath and Trinity River basins. Since prehistoric times, the fishery resources of the Klamath and Trinity Rivers have been the mainstay of Native American culture and life in the area.

The TRD's construction and operation resulted in the diversion of up to ninety percent (90%) of the average annual discharge into the Trinity River at Lewiston Dam (1,234,000 AF of the 1,396,000 AF inflow), and blocked access to 109 miles of steelhead and salmon spawning and rearing habitat. In response to declining fisheries and degraded habitat conditions, Interior decided in 1981 to increase flows into the Trinity River ranging from 140,-000 AF to 340,000 AF annually.[6] In addition, the United States Fish and Wildlife Service ("USFWS") was directed to undertake a Flow Evaluation Study to assess fish habitat at various flows, summarize the effectiveness of other instream and watershed restoration activities, and recommend appropriate flows and other measures necessary to better maintain favorable habitat conditions. The study began in October 1984 and was completed by a June 1999 report.

In October 1984, Congress enacted the Trinity River Basin Fish and Wildlife Management Act[7] ("1984 Act") to restore fish and wildlife populations to pre-TRD levels. The 1984 Act found that the TRD had contributed to a "drastic reduction in the anadromous fish populations." Public

**6.** An Environmental Impact Statement analyzing the impacts of increasing the instream flow of the Trinity River to 340,000 AF was issued on December 5, 1980.

**7.** SECTION 1: The Congress finds that—

(1) the construction of the Trinity River division of the Central Valley project in California, authorized by the Act of August 12, 1955 (69 Stat. 719), has substantially reduced the streamflow in the Trinity River Basin thereby contributing to damage to pools, spawning gravels, and rearing areas and to a drastic reduction in the anadromous fish populations and a decline in the scenic and recreational qualities of such river system;

(2) the loss of land areas inundated by two reservoirs constructed in connection with such project has contributed to reduc-

tions in the populations of deer and other wildlife historically found in the Trinity River Basin;

(3) the Act referred to in paragraph (1) of this section directed the Secretary of the Interior (hereinafter in this Act referred to as the "Secretary") to take appropriate actions to ensure the preservation and propagation of such fish and wildlife and additional authority was conferred on the Secretary under the Act approved September 4, 1980 (94 Stat. 1062), to take certain actions to mitigate the impact on fish and wildlife of the construction and operation of the Trinity River division;

(4) activities other than those related to the project including, but not limited to, inadequate erosion control and fishery harvest management practices, have also had

Law 98–541, Section 1(1). It directed that the restoration program include:

(1) The design, construction, operation, and maintenance of facilities to—

(A) rehabilitate fish habitats in the Trinity River between Lewiston Dam and Weitchpec;

(B) rehabilitate fish habitats in tributaries of such river below Lewiston Dam and in the south fork of such river; and

(C) modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery.

(2) The establishment of a procedure to monitor (A) the fish and wildlife stock on a continuing basis, and (B) the effectiveness of the rehabilitation work.

(3) Such other activities as the Secretary determines to be necessary to achieve the long-term goal of the program.

Public Law 98–541, Section 2(a).

In 1991, the Secretary of the Interior increased the minimum flows in the Trinity River to 340,000 AF/year until the Trinity River flow study was completed. The 340,000 AF number was the third-lowest unregulated flow on record.

In 1992, Congress enacted the CVPIA to annually redirect part of the CVP's water to the environment. CVPIA § 3406(b)(23) specifically authorizes and directs Interior to restore the Trinity River. It requires that not less than 340,000 AF of water be released into the Trinity River each year for water years 1992–1996 in order to meet federal trust responsibilities to the Hoopa Valley Tribe *and to meet the restoration goals of the 1984 Act.* CVPIA § 3406(b)(23). It directs the Secretary of the Interior ("Secretary"), after consultation with the Hoopa Valley Tribe to complete the Trinity River Flow Evaluation Study ("TRFES"), which had already begun pursuant to the January 14, 1981 Secretarial Decision, no later than September 30, 1996. CVPIA § 3406(b)(23)(A). The

significant adverse effects on fish and wildlife populations in the Trinity River Basin and are of such a nature that the cause of any detrimental impact on such populations cannot be attributed solely to such activities or to the project;

(5) a fish and wildlife management program has been developed by an existing interagency advisory group called the Trinity River Basin Fish and Wildlife Task Force; and

(6) the Secretary requires additional authority to implement a basin-wide fish and wildlife management program in order to achieve the long-term goal of restoring fish and wildlife populations in the Trinity River Basin to a level approximating that which existed immediately before the start of the construction of the Trinity River division. TRINITY RIVER BASIN FISH AND WILDLIFE MANAGEMENT PROGRAM

SEC. 2. (a) Subject to subsection (b), the Secretary shall formulate and implement a fish and wildlife management program for the Trinity River Basin designed to restore the fish and wildlife populations in such basin to the levels approximating those which existed immediately before the start of the construction referred to in section 1(1) and to maintain such levels. The program shall include the following activities:

(1) The design, construction, operation, and maintenance of facilities to—

(A) rehabilitate fish habitats in the Trinity River between Lewiston Dam and Weitchpec;

(B) rehabilitate fish habitats in tributaries of such river below Lewiston Dam and in the south fork of such river; and

(C) modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery.

(2) The establishment of a procedure to monitor (A) the fish and wildlife stock on a continuing basis, and

(B) the effectiveness of the rehabilitation work.

(3) Such other activities as the Secretary determines to be necessary to achieve the long-term goal of the program.

. . . .

Public Law 98–541, 98 Stat. 2721.

TRFES was to be performed "in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." *Id.* Section 3406 then directs the Secretary to forward the TRFES recommendations to several congressional committees no later than December 31, 1996. CVPIA § 3406(b)(23)(B). If the Secretary and the Hoopa Valley Tribe concurred in the TRFES recommended increases for Trinity River instream fishery flow releases established under CVPIA § 3406(b)(23)(B), such restoration flows were to be implemented accordingly. *Id.* If they did not concur, the 340,000 AF minimum flows must remain in effect unless increased by an act of Congress, appropriate judicial decree or agreement between the Secretary and the Hoopa Valley Tribe. *Id.*

In 1996, Congress amended the 1984 Act by the Trinity River Basin Fish and wildlife Management Reauthorization Act of 1995, Pub.L. No. 104–408, 110 Stat. 1338 (1996). The TRFES was not timely completed. Congress directed that Trinity River restoration be measured not only by returning adult anadromous fish spawners, but also by the ability of dependant tribal, commercial, and sport fisheries to participate fully, through in-river and ocean harvest opportunities, in the benefits of the restoration. Pub.L. No. 104–408. Congress also included language amending the activities to be undertaken by the Secretary. *Id.* The original language directed the Secretary to "modernize and otherwise increase the effectiveness of the Trinity River fish hatchery." The 1996 Act adds "so that it can best service its purpose of mitigation of fish habitat loss above Lewiston Dam while not impairing efforts to restore and maintain naturally reproducing anadromous fish stocks within the basin." *Id.*

In January 1998, the draft Trinity River Flow Evaluation Report (TRFER) was released. In June 1999, Interior, in consultation with the Hoopa Valley Tribe, published the Trinity River Flow Evaluation Final Report ("TRFEFR"). The TRFEFR recommends permanently increasing the Trinity River fish flows from the statutorily mandated 340,000 AF/year to between 368,900 and 815,200 AF/year, as follows:

| Water Year Class | Instream Volume (x 100 acre-feet) | Probability of Occurrence |
|---|---|---|
| Extremely Wet | 815.2 | 0.12 |
| Wet | 701.0 | 0.28 |
| Normal | 646.9 | 0.20 |
| Dry | 452.6 | 0.28 |
| Critically Dry | 368.6 | 0.12 |
| Weighted Average | 594.5 | |

TRFEFR § 8.1, p. 241.

On October 19, 1999, the United States Bureau of Reclamation ("Bureau") and the USFWS released the draft "Trinity River Mainstem Fishery Restoration Environmental Impact Statement/Report" ("DEIS"), which described alternate approaches for restoring and maintaining the Trinity River fishery. Interior published the availability of the draft EIS/EIR and

the commencement of a public comment period scheduled to end on December 8, 1999. 64 Fed.Reg. 56364, 1999 WL 827447 (Oct. 19, 1999). The public comment period was extended until January 20, 2000. 64 Fed.Reg. 67584, 1999 WL 1078497 (Dec. 2, 1999); 64 Fed.Reg. 72357, 1999 WL 1247501 (Dec. 27, 1999).

On January 20, 2000, San Luis & Delta–Mendota Water Authority ("San Luis") submitted written comments[8] criticizing the DEIS, noting, *inter alia,* that the DEIS failed to analyze the preferred alternative's potential adverse environmental impacts on federally listed endangered or threatened fish species within the Sacramento River system and the Sacramento–San Joaquin Delta ("Delta"), and also failed to analyze how these adverse impacts, if any, could be minimized or avoided. Doc. 35 at ¶¶ 39–40 & Ex. A.

On March 10, 2000, Westlands Water District ("Westlands") and San Luis sent a sixty-day notice of intent to sue to Interior, threatening suit if Interior did not undertake a formal ESA consultation on the TRFEFR. On March 29, 2000, Interior forwarded the TRFEFR to Congress, pursuant to CVPIA § 3406(b)(23) ("the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study . . . to the Committee on Energy and Natural Resources and the Select Committee on Indian Affairs of the Senate and the Committee on Interior and Insular Affairs and the Committee on Merchant Marine and Fisheries of the House of Representatives. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established

under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly.").

On May 8, 2000, Interior responded to San Luis' letter, acknowledging that ESA " § 7 consultation over potential effects to species listed as either threatened or endangered under the ESA . . . must be accomplished as part of the process of making a decision on the Program." It reassured that "no final decision on the Program will be made until both the USFWS and NMFS have issued biological opinions regarding implementation of the Program, and that these opinions will be taken into consideration in making such decisions."

On October 12, 2000, the National Marine Fishery Service ("NMFS") formally issued the "Biological Opinion for the Trinity River Mainstem Fishery Restoration EIS and Its Effects on Southern Oregon/Northern California Coast Coho Salmon, Sacramento River Winter-run Chinook Salmon, Central Valley Spring-run Chinook Salmon, and Central Valley Steelhead" ("BioOp."). This BioOp recognizes that implementation of the report will affect many aspects of the river, including decreased water flows, and discusses reasonable and prudent measures ("RPMs") to minimize or avoid the preferred alternative's impacts on "federally listed" fish.

Also on October 12, 2000, the USFWS issued "Re[-]initiation of Formal Consultation: Biological Opinion of the Effects of Long-term Operation of the Central Valley Project and State Water Project as Modified by Implementing the Preferred Alter-

---

**8.** "Comments of the San Luis & Delta–Mendota Water Authority on the Trinity River Mainstem Fishery Restoration Environmental Impact Statement/Environmental Impact Report," dated January 19, 2000.

native in the Draft Environmental Impact Statement/Environmental Impact Report for the Trinity River Mainstem Fishery Restoration Program" ("USFWS BioOp"). On November 17, 2000, Interior published notice of the availability of the final EIS/EIR ("FEIS"). 65 Fed.Reg. 69512, 2000 WL 1711646 (Nov. 17, 2000).

On December 14, 2000, Westlands filed suit against defendants, alleging three claims:

(1) "maladministration" of the Endangered Species Act ("ESA") by the USFWS;

(2) maladministration of the ESA by NMFS; and,

(3) violation of NEPA by all defendants.

Doc. 1 at 15–24. That same day, Westlands sought an emergency court order to enjoin the defendant, Bruce Babbitt (as Secretary of the Interior), from executing a Record of Decision ("ROD") with the Hoopa Valley Tribe, scheduled to be signed on Tuesday, December 19, 2000. On December 15, the Hoopa Valley Tribe intervened as a defendant in the case.

The motion for a Temporary Restraining Order ("TRO") was denied in open court on the afternoon of December 15, 2000, and the confirming written order was entered on January 30, 2001. Doc. 85. The application for a TRO was denied because at the time of the December 15 hearing, Secretary Babbitt had not yet signed the ROD. The signing was scheduled for December 19, 2000. Until the ROD was signed, there was no "final agency action" that Westlands could challenge and no authority existed to enjoin the Executive from implementing the statutory function of reaching agreement with the Indian Tribes on the Trinity River Restoration Plan. *Id.* at 4–5.

On December 18, 2000, the Hoopa Valley Tribe concurred in the TRFES recommendations. On December 19, 2000, Secretary Babbitt and the Senior Chairman of the Hoopa Valley Tribal Council signed the ROD. The ROD directs Interior's agencies "to implement the Preferred Alternative as described in the FEIS/EIR and as provided below," and "to implement the reasonable and prudent measures described in the NMFS and [USFWS] Biological Opinions."

The ROD's stated purpose is: restoration and perpetual maintenance of Trinity River's fishery resources by rehabilitating the river and restoring attributes of a healthy, functioning alluvial river system. AR 17694–95. The essential components to do so are:

1. Permanently increase variable annual flows for the Trinity River;

2. Rehabilitate physical channels, remove riparian berms and establish side channel habitat;

3. Sediment management to increase spawning gravels and reduce fine sediments;

4. Restore the watershed damage by land use practices;

5. Improve infrastructure, including bridges and other structures affected by peak flows.

On January 5, 2001, Westlands and two new plaintiffs, the San Luis and Delta–Mendota Water Authority, and the San Benito County Water District (collectively "water districts"), filed a first amended complaint against the federal defendants, alleging four causes of action:

(1) maladministration of the ESA by the USFWS, claiming that by "issuing a non-jeopardy biological opinion that

requires a major change in CVP operations [*i.e.,* preventing any upstream movement of 0.5 km or more of the X2 water quality standard], the USFWS has exceeded its authority under the Endangered Species Act;"

(2) maladministration of the ESA by NMFS, claiming that NMFS acted arbitrarily and capriciously and in excess of its authority under the ESA by issuing a biological opinion that internally conflicts, because it states on one hand that "NMFS does not anticipate that implementation of the proposed flow schedules will incidentally take any SONCC coho salmon," and on the other hand, prescribes RPMs to deal with incidental take;

(3) violation of NEPA by all defendants, claiming that: (a) the draft and final EIS/EIRs do not analyze the impacts of implementing the requirements of the USFWS and NMFS biological opinions; (b) the final EIS/EIR does not adequately describe what CVP operational changes will occur to protect or mitigate the adverse effect upon listed fish, upon which the draft EIS/EIR acknowledges implementation of the preferred alternative may have a significant adverse impact, and simply defers mitigation consideration until later; (c) because the biological opinions modified the proposed action by creating new environmental impacts (or new circumstances and information), the defendants failed to supplement the EIS/EIRs to analyze

these impacts and publish the analysis for public comment; (d) the draft and final EIS/EIR do not fairly evaluate alternatives, and are in essence a "post hoc rationalization to justify a course of action decided upon before NEPA review even began;" (e) the EIS/EIRs utilize improper definitions of proper purpose by using the "healthy river" standard rather than an objective standard; and, (f) the final EIS/EIR, or a supplement thereto, does not analyze the impact of implementation of the preferred alternative on California's current energy crisis; and,

(4) violation of the Administrative Procedure Act ("APA"), claiming that the TRFEFR's recommendations adopted by the ROD are not based on the best available scientific data in violation of CVPIA § 3406(b)(23)(A), and its conclusions are arbitrary and capricious.

Doc. 35. The Yurok Tribe intervened as a defendant on January 19, 2001. On February 8, 2001, the Northern California Power Agency ("NCPA") and the Sacramento Municipal Utility District ("SMUD") intervened as plaintiffs over the opposition of the Hoopa Valley and Yurok Tribes.[9]

The water districts filed a motion for preliminary injunction on January 5, 2001 and NCPA and SMUD moved for a preliminary injunction on February 6, 2001. A preliminary injunction issued on March 22, 2001 limiting the amount of water releases under the ROD to a total of 368,600 AF. All other aspects of the ROD's Trinity River restoration plan were not enjoined.

---

**9.** NCPA's complaint-in-intervention, previously lodged on January 5, 2001, was filed on February 6, 2001. Doc. 105. SMUD's complaint-in-intervention, previously lodged on January 5, 2001, was filed on February 6, 2001. Doc. 109.

The decision, made without a complete administrative record, found plaintiffs were likely to succeed on the merits of their claim because the two BioOps imposed significant environmental impacts that were not analyzed in a supplemental EIS/EIR ("SEIS") and the California energy crisis was a changed circumstance that should have been evaluated, but was not.

On September 7, 2001, the United States, the water districts, NCPA, and SMUD, but not the Tribes, entered into and filed a stipulation to stay the proceedings in this case until Interior issued a revised ROD following completion of an SEIS. The federal defendants and plaintiffs agreed that the preliminary injunction would remain in place unless otherwise ordered by the court. The defendant-intervenor Tribes did not oppose the stay order, but did not join the stipulation because of paragraphs eight [10] and nine [11] which they believed demanded actions not

required by law. However, they found the proposed order "unobjectionable." On October 8, 2001, the court signed the stay order.

On March 14, 2002, the Tribes moved to modify the preliminary injunction for water year 2002 alleging changed circumstances. On April 19, 2002, the preliminary injunction was modified to authorize the release of 468,600 AF of water into the Trinity River for the purposes of fishery protection and restoration for water year 2002. All other aspects of the Trinity River restoration plan were not subject to the injunction. The order modifying the preliminary injunction also vacated the stay and set a schedule for disposition of the case on the merits. To the court's knowledge, work on the SEIS ceased.

On June 11, 2002 the water districts, NCPA, SMUD, the federal defendants, and the Hoopa Valley Tribe filed cross-motions for summary judgment. The Yurok Tribe did not file a cross-motion for

10. Paragraph eight states:
The SEIS will address, among other topics, the issues identified by this Court as requiring further analysis, including impacts from the ROD or changes to Trinity River flows on the provision of electrical power to the Central Valley Project and the power grid serving the State of California, along with the effects of the Endangered Species Act § 7 biological opinions issued by the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS).

11. Paragraph Nine states:
The federal defendants have advised the parties to this litigation that, through the SEIS scoping process, any person or party will have the opportunity to present other issues that they believe should be included in the SEIS and that the federal defendants will carefully consider all such presentations. In addition to the formal scoping and public comment processes under NEPA and the CEQ regulations, the federal defendants will use the available legal procedures to invite and consider technical information and expert advice from all sources. These procedures will allow scientific and technical discussion among the scientists and technical experts of the federal defendants, plaintiffs, plaintiff-intervenors, and defendant-intervenors, and others having such expertise, so as to maximize the value of the scientific and technical input from non-federal sources. The goal of these procedures is to make the SEIS a thorough, comprehensive, and scientifically sound document, as required by NEPA and the CEQ regulations. When completed, the federal defendants will prepare a revised ROD. In conjunction with the SEIS and revised ROD, the federal defendants will consult with FWS and NMFS under ESA § 7, as appropriate. The SEIS, revised ROD, and any biological opinions will be subject to legal challenge on any legally cognizable grounds in this or independent litigation by any party.

summary judgment but opposed the water districts', NCPA's, and SMUD's motions.

## III. LEGAL STANDARD

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir.2001).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

## IV. DISCUSSION

Plaintiffs and plaintiff-intervenors [12] move for summary judgment on five NEPA issues: 1) the Preferred Alternative's impact on the ESA-listed species in the Sacramento River and Delta were not adequately assessed; 2) the impacts of mitigation measures mandated by the BioOps were not properly assessed; 3) the impact of the Preferred Alternative on power system reliability was not adequately assessed; 4) Interior improperly applied an unreasonably narrow definition of EIS purpose and artificially restricted the range of alternatives considered under NEPA; and 5) Interior's environmental assessment was too late. They also move for summary judgment on two ESA issues:

---

**12.** The water districts and plaintiff-intervenors divided the arguments among themselves and then joined each others' motions. The water districts and plaintiff-intervenors, SMUD and the power generators, will be referred to jointly as "plaintiffs."

1) the USFWS BioOp unlawfully mandates major changes to CVP operations; 2) the NMFS BioOp arbitrarily mandates implementation of the ROD flows in the absence of the lethal take of Trinity River fish. Finally, plaintiffs move for summary judgment arguing the Secretary's actions in authorizing the ROD flows were arbitrary and capricious in that there was no adequate basis in experience or science for determining that the adopted permanent flows are necessary or beneficial.

The Hoopa Valley Tribe opposes Plaintiffs' summary judgment motions arguing: 1) further NEPA review is irreconcilable with the CVPIA; and 2) the ROD is neither arbitrary, capricious, nor contrary to law. The Tribe also argues that the CVPIA and equity principles limit the available remedies.

The federal defendants move for summary judgment arguing they have complied: 1) with NEPA; and, 2) with the ESA. The Yurok Tribe argues that the federal government's trust responsibility requires restoration be given "paramount consideration."

## A. *APPLICABILITY OF FURTHER NEPA REVIEW UNDER CVPIA § 3406(b)(23)*

The Hoopa Tribe contends that the Secretary has no discretion to delay implementing the flow study recommendations because the Tribe formally concurred in those recommendations in December 2000 and under CVPIA § 3406(b)(23) the Secretary no longer has discretion after such a concurrence.

■ NEPA requires federal agencies, to the fullest extent possible, to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," an environmental impact statement that includes the impacts of and alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). NEPA is given the broadest possible interpretation. *Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 460 (9th Cir.1994). The phrase "to the fullest extent possible" is not "accidental nor hyperbolic." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). Instead it directs that environmental factors be considered and "not be shunted aside in the bureaucratic shuffle." *Id.*

■ There are however, exceptions to this rule. Where there is a clear and unavoidable conflict in statutory authority, NEPA gives way. *Id.* at 788, 96 S.Ct. 2430. The test is "whether, assuming an environmental impact statement would otherwise be required in this case, requiring the Secretary to prepare such a statement would create an irreconcilable and fundamental conflict with the Secretary's duties." *Id.; Westlands*, 43 F.3d at 460 ("Only if there is an 'irreconcilable' conflict between the statute and NEPA will the requirements of NEPA not apply.").

The Hoopa Valley Tribe contends that there are two ways in which NEPA is irreconcilable with CVPIA § 3406(b)(23): 1) the statutorily mandated time period is too short to allow compliance; and 2) the Secretary lacks discretion.

### 1. *Statutorily Mandated Time Frame*

■ There is an irreconcilable conflict when a statute mandates a fixed time period for implementation and this time period is too short to allow the agency to comply

with NEPA. *Flint Ridge*, 426 U.S. at 791, 96 S.Ct. 2430; *Westlands*, 43 F.3d at 460. In *Flint Ridge*, the Supreme Court found that a 30–day window within which the Secretary of Housing and Urban Development had to act, was too short to allow compliance with NEPA and this caused irreconcilable conflict. In *Westlands*, the Ninth Circuit held CVPIA §§ 3406(b)(2) and (d)(1) were irreconcilable with NEPA because upon enactment, the statute directed the Secretary to take immediate action. *Westlands*, 43 F.3d at 460.

 Section 3406(b)(23) of the CVPIA provides:

(A) by September 30, 1996, the Secretary, after consultation with the Hoopa Valley Tribe, shall complete the Trinity River Flow Evaluation Study currently being conducted by the United States Fish and Wildlife Service under the mandate of the Secretarial Decision of January 14, 1981 . . . ; and

(B) not later than December 31, 1996, the Secretary shall forward the recommendations of the Trinity River Flow Evaluation Study, referred to in subparagraph (A) of this paragraph, to [Congress]. If the Secretary and the Hoopa Valley Tribe concur in these recommendations, any increase to the minimum Trinity River instream fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly. If the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases established under this paragraph shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and· the Hoopa Valley Tribe.

Pub.L. No. 102–575, § 3406(b)(23), 106 Stat. 4600, at 4720–21.[13] The Hoopa Tribe concedes that the four years between the 1992 enactment of the CVPIA and the 3406(b)(23)(A) September 30, 1996 deadline provide sufficient time for the Secretary to comply with NEPA. The Tribe argues that implementation of restoration action cannot be further postponed for additional NEPA review because: 1) the deadlines in Section 3406(b)(23) have already passed; and 2) Congress directed that review should end once the Tribe concurred in the recommendation.[14]

In *Flint Ridge*, the Supreme Court held the phrase "to the fullest extent possible" in 42 U.S.C. § 4332 was not to be used to shunt aside consideration of environmental factors "in the bureaucratic shuffle." *Flint Ridge*, 426 U.S. at 787, 96 S.Ct. 2430. "The purpose of the new language is to make it clear that each agency of the Federal Government Shall comply with the

---

13. The Tribe argues that as a native tribe, the statute should be construed in its favor. Generally statutes are to be construed liberally in favor of tribes and ambiguities should be decided in their favor. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). The rule of statutory construction to which the Tribe refers does not apply in this situation because the statute is clear.

14. At oral argument the Tribe also argued that there were two deadlines in Section (b)(23) and the three-month period between the first deadline and second deadline was too short for NEPA review. Section (b)(23) requires the TRFES to be completed by September 30, 1996 and that not later than December 31, 1996 the recommendations in the TRFES must be forwarded to Congress. Separate NEPA analyses were not required, however, Interior did not comply with either deadline.

directives set out in (§ 102(2)) Unless [sic] the existing law applicable to such agency's operations expressly prohibs [sic] or makes full compliance with one of the directives impossible .... [T]he language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directive set out in said section 'to the fullest extent possible' under their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." *Id.* at 787–88, 96 S.Ct. 2430 (quoting 115 Cong. Rec. 39703 (1969) (House conferees)).

Section 3406(b)(23), enacted in 1992, gave the Secretary four years to complete and present to Congress a flow and restoration study of the Trinity River originally called for by 1984 legislation, which had been in progress for eleven years (since 1981 when the original restoration studies commenced). By the 1996 statutory deadline, the Secretary had taken 15 years to prepare for and complete the NEPA process.[15] As the federal defendants admitted at oral argument, CVPIA § 3406(b)(23) does not "irreconcilably and fundamentally conflict" with NEPA nor is there a clear or unavoidable conflict. *See Jones v. Gordon,* 792 F.2d 821, 826 (9th Cir.1986) (*"Flint Ridge* applies only when a conflict is 'clear and unavoidable' and 'irreconcilable and fundamental.'"). Compliance with both statutes was entirely possible. The delay or inactions of the federal defendants cannot create a statutory conflict. *See Forelaws on Board v. Johnson,* 743 F.2d 677, 683–85 (9th Cir.1984) (holding that agency's failure to initiate EIS within 9–month statutory deadline for action did not excuse NEPA compliance under *Flint Ridge* ).

■ If the requirements of NEPA are to have meaning, federal agencies cannot be excused from compliance simply because they move at glacial speed. To apply the *Flint Ridge* exception to this case, where the federal agency had four years to comply with NEPA and there was well-known statutory concern for compliance with environmental laws,[16] would negate NEPA review whenever there is a statutory time deadline for action. Federal agencies could avoid NEPA compliance simply by waiting long enough. This defeats the congressional public scrutiny and participation purposes embodied in NEPA. The *Flint Ridge* exception does not apply.

The Hoopa Tribe argues that once it concurred in the recommendations, immediate implementation was mandatory, and under *Westlands* there was no more time to comply with the NEPA requirements. Section 3406(b)(23) is not directly analogous to Sections 3406(b)(2) and (d)(1). Sections (b)(2) and (d)(1) require the Sec-

---

**15.** It was eighteen years from the time the study was conceived until the TRFES was published, it was another year before the Secretary presented the recommendations to Congress, sought the Hoopa Valley Tribe's concurrence and was prepared to act upon the recommendations.

**16.** "The Secretary, immediately upon the enactment of this title, shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act,

16 U.S.C. 1531, et seq...." Pub.L. No. 102–575, § 3406(b). *Westlands,* holds that the subsections of Section 3406(b) control over its general statements. *Westlands,* 43 F.3d at 461. However, Section 3406(b) is not quoted here for the purpose of determining which section is controlling, but merely to note that at the time Section 3406 was passed, Congress was concerned about compliance with other federal environmental laws.

retary to take action to operate the CVP as directed immediately upon enactment. Section (b)(23) gave the Secretary four years to act. The Tribe argues that the correct performance time period is not the time between enactment and the deadline, but between the Tribe's concurrence, signing of the ROD and implementation of the flow and restoration recommendations. This argument ignores that the Secretary had ample time to complete the NEPA analysis within the statutorily allotted time. If it was possible for the Secretary to perform a NEPA analysis, NEPA and *Flint Ridge* require it be done. That the deadline passed does not abrogate this duty. *See Forelaws,* 743 F.2d at 683–86 (holding EIS required despite the fact that the statutory deadline for action had passed).[17] *Flint Ridge* does not apply to this case. Section (b)(23) requires both the Hoopa Valley Tribe's and the Secretary's concurrence. If the Secretary did not lawfully concur, the prerequisites for increasing flows under (b)(23) were not met, whether or not the Hoopa Valley Tribe concurred. Even if (b)(23) did preclude further NEPA analysis after concurrence, joint concurrence was required.

### 2. *Secretarial Discretion*

■ The Tribe maintains the Secretary has no discretion not to implement the flow recommendations after the Tribe concurred. Where a federal agency lacks the ability to meaningfully influence a particular action, the procedural requirements of NEPA do not apply. *Sierra Club v.*

*Babbitt,* 65 F.3d 1502, 1512–13 (9th Cir. 1995). "[NEPA's] procedural requirements are triggered by a discretionary federal action." *Id.* at 1512.

■ Section 3406(b)(23) has several requirements: 1) the TRFES had to be completed by September 30, 1996; 2) not later than December 31, 1996 the Secretary had to forward the TRFES recommendations to several congressional committees; 3) if the Secretary and the Hoopa Valley Tribe concurred in the recommendations they were to be implemented accordingly. The automatic, non-discretionary language was only operative *after* both the Hoopa Valley Tribe and the Secretary concurred. The Secretary had full discretion under Section 3406(b)(23), before any concurrence, to scope, analyze, and decide what flow recommendations to make to Congress. During the four year statutorily authorized period for study and formulation of such recommendations there was ample time to conduct a NEPA review. The TRFER was not completed until June 1999. The EIS process commenced in 1986. The DEIS was released October 19, 1999; public comment was extended through January 20, 2000. The TRFER was forwarded to Congress March 10, 2000; Biological Opinions were issued October 12, 2000, and the FEIS/R was completed and published November 17, 2000. The tribe signed the ROD December 19, 2000. The lack of discretion exception to NEPA compliance does not apply. The Secretary was required to comply with NEPA before making flow recommendations, a major

---

**17.** The Tribe argues that "the fact that the statue [sic] *did* provide *some* time for NEPA review, and the fact that Interior did engage in extensive NEPA review, is to conclude that the statute allows for limited NEPA compliance." Hoopa Valley Tribe's Reply, Doc. 285 at 6:14–16 (emphasis in original). The Ninth

Circuit in *Forelaws* disapproved a similar argument. It found that an agency's environmental review that did not comply with NEPA was not sufficient even though the agency only had a statutorily mandated 9–month period in which to act. *Forelaws,* 743 F.2d at 683–85.

federal action which had the potential to adversely effect the environment.

There was adequate time to complete NEPA review before the ROD was signed. The TRFER could not be implemented before that time. The Hoopa Valley Tribe's motion for summary judgment, on the issue that compliance with NEPA is not required because § 3406(b)(2) is irreconcilably inconsistent with NEPA, is DENIED.

## B. *NEPA CLAIMS*

NEPA is the "the basic national charter for protection of the environment." *Churchill County v. Norton,* 276 F.3d 1060, 1072 (9th Cir.2001), *amended by* 282 F.3d 1055 (9th Cir.2002) (quoting *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1215 (9th Cir.1998)). It is designed to ensure that federal agencies will have available, and carefully consider, detailed information concerning significant public impacts. *Id.* It "guarantees that the relevant information will be made available to the larger public audience." *Id.* (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). "NEPA also 'emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct.' " *Id.* at 1072–73 (quoting *Blue Mountains,* 161 F.3d at 1216) (internal citation omitted).

■■■■ NEPA requires federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Because NEPA does not contain a judicial review provision, an agency's compliance with NEPA is reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Ka Makani 'O Kohala Ohana Inc. v. Water Supply,* 295 F.3d 955, 959 (9th Cir. 2002). A decision not to prepare an EIS is reviewed under the arbitrary-and-capricious standard, unless the agency does not perform an environmental assessment. *Id.; Churchill County,* 276 F.3d at 1071. If there is no environmental assessment, the reasonableness standard is used. *Ka Makani,* 295 F.3d at 958.

■■■■ The adequacy of an EIS is reviewed under the "rule of reason" standard. *Churchill County,* 276 F.3d at 1071. "Under this standard, we ask 'whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Id.* (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974)). To determine whether an EIS was reasonably thorough courts must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.* (quoting *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982)).

■■■■ When deciding NEPA claims, a court may not impose its own notion of which procedures are best. *Id.* at 1072. Instead, a court's role is to take "a hard look." *Id.* "[NEPA] is not meant to 'mandate particular results' but to provide a process to ensure that federal agencies take a 'hard look' at the environmental consequences of proposed acts. When an agency makes a decision subject to the NEPA's procedural requirements, 'the

only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive. . . .'" *Tillamook County v. U.S. Army Corps of Engineers*, 288 F.3d 1140, 1143–44 (9th Cir.2002) (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980)). Courts must strictly interpret the procedural requirements of NEPA "'to the fullest extent possible' consistent with the policies embodied in NEPA." *Churchill*, 276 F.3d at 1072.

Plaintiffs move for summary judgment on six NEPA issues: 1) the Preferred Alternative's impact on the ESA-listed species in the Sacramento River and Delta was not adequately assessed; 2) the impacts of mitigation measures mandated by the BioOps were not properly assessed; 3) the impacts of the Preferred Alternative on power system reliability were not adequately assessed; 4) Interior improperly applied a wrongfully narrowed EIS purpose to artificially restrict the range of alternatives considered under NEPA; 5) Interior failed to consider and adopt an integrated management alternative; and, 6) the EIS was performed too late.

### 1. *Assessment of Sacramento River and Delta ESA–Listed Species*

The claim the DEIS does not analyze the effects of the Preferred Alternative on endangered fish species in the Sacramento River and Delta, and that the issuance of the BioOps did not cure the violation, centers on the contention the public did not have an opportunity to review and comment on the BioOps' analyses. The Preferred Alternative recognizes two overriding objectives: increasing anadromous natural fish production and allowing continued water exports and flood control. EIS 2–3. One screening opportunity adopted as part of the Preferred Alternative is to balance environmental and social beneficial and adverse impacts across the Trinity River Basin, Lower Klamath River Basin, Coastal Area, and Central Valley Basin. *Id.* Plaintiffs advance three contentions: 1) the DEIS did not discuss the Preferred Alternative's direct effects and significance on the Sacramento River and Delta ESA-listed species; 2) when notified of the deficiency, Interior failed to recirculate or adequately supplement the DEIS; and, 3) the addition of language from the BioOps to the FEIS did not cure the DEIS' deficiencies. The federal defendants and the Hoopa Tribe argue the DEIS contained adequate analysis of the Preferred Alternative's impact on the Sacramento ESA-listed species, that the DEIS did not need to be recirculated, and that the inclusion of additional information in the FEIS was sufficient.

### a. *DEIS Analysis on Sacramento ESA–Listed Species*

Plaintiffs claim, "while the DEIS admits that the Preferred Alternative could cause 'significant impacts' associated with the 'increased frequency of Sacramento basin temperature and carryover storage violations,' the DEIS does not analyze those impacts. 18 AR 10653. Rather, it states that these impacts 'would need to be evaluated by the NMFS pursuant to ESA.'" 18 AR 10653. Doc. 244 at 5:3–6 (NCPA P & A's). Defendants point to numerous sections of the DEIS that analyze these impacts.

There is some merit to each position. The DEIS does analyze the impact of the Preferred Alternative on the ESA-listed species in the Sacramento River and Delta.

DEIS at 3–167–169 3–172–173, 3–175–177, 3–179–184, B–60–61, B–65, B–74–75, B–77–78, B–89–90. "Compared to existing conditions, the Preferred Alternative would adversely affect fall, winter, and spring chinook salmon by significantly increasing mortality of early life stages of these species within the upper Sacramento River." DEIS, at 3–178. "[D]uring all months from February through June, Delta outflows were greater than 10 percent of the years simulated (Table 3–16). Those reductions in Delta outflow may be significant and may adversely affect habitat for Delta species." DEIS, at 3–184. The DEIS does not consider or identify mitigation measures for the admitted significant impacts to those species, except to specify "mitigation for impacts to the Delta smelt and Sacramento splittail would consist of consulting with the Service on impacts and implementing any 'required conservation measures.'" DEIS, at 3–184.[18] This defers consideration of mitigation efforts to the BioOps.[19] "In that the potential adverse effects to listed species identified in the DEIS/EIR are the subject of consultation under Section 7 of the Endangered Species Act (ESA), with both the U.S. Fish and Wildlife Service (Service) and National Marine Fisheries Service (NMFS), it was entirely appropriate to defer describing

specific minimization actions until the consultations had been completed." FEIS, D2–65. Consideration of the impacts, not only on Delta species, but all other secondary impacts which would result, were necessarily deferred to future analysis.

The Council on Environmental Quality (CEQ) regulations, which implement NEPA, require a DEIS be prepared and circulated prior to the issuance of an FEIS. 40 C.F.R. § 1502.9(a). The DEIS "must fulfill and satisfy to the fullest extent possible the requirements established for final statements." *Id.* "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." *Id.* The CEQ regulations further direct that a DEIS or FEIS be supplemented if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). CEQ regulations provide that "[t]o the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by ... the Endangered Species Act of 1973, and other environmental review laws and executive orders." 40 C.F.R. § 1502.25(a).

---

18. *See also* DEIS 3–178:
Significant impacts requiring mitigation for adverse effects to anadromous salmonids in the Sacramento River system associated with the Maximum Flow, Flow Evaluation, and Percent Inflow Alternatives would include reconsultation with NMFS under the 1993 Biological Opinion for Winter Chinook Salmon. In those years (primarily drought conditions) when carryover storage in Shasta Reservoir is less than 1.9 maf, Reclamation and NMFS would re-initiate consultation in an attempt to minimize losses of winter chinook salmon. Reclamation would re-operate Shasta Dam in an effort

to reduce losses of winter chinook salmon to less than that resulting in a jeopardy opinion.
No mention is made of what the re-operation of Shasta Dam would entail or what effects it would have.

19. Under the Water Quality section of the DEIS, some possible mitigation measures are discussed for the increased number of temperature and carryover storage violations that are expected to occur as a result of implementing the Flow Evaluation Alternative. DEIS, at 3–149.

**1184**

The question here is whether the DEIS's deferral to future BioOps, rather than identifying impacts and discussing mitigation measures in the DEIS, fails to provide "meaningful analysis." An EIS must contain a discussion of possible mitigation measures. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000); *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir.1998). "Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson*, 490 U.S. at 351–52, 109 S.Ct. 1835 (quoting 42 U.S.C. § 4332(C)(ii)) (internal citations omitted). "Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Id.* Failure to discuss possible mitigating measures precludes the parties from meaningful analysis and Interior did not circulate a revised draft.[20]

### b. *Timing of the EIS*

Plaintiffs' assertion that a final EIS should have been completed before the Trinity River flow study was submitted to Congress is answered by Interior's position that the EIS was programmatic and project specific and centered on the recommendations for restoring Trinity River flows and related measures to reha-

bilitate the fishery, which in turn had to be reviewed by Congress and then concurred in by the Hoopa Valley Tribe. FEIS pp. 1–3. Title 40 C.F.R. § 1508.25(a)(2) authorizes a programmatic EIS for "[c]umulative actions, which, when viewed with other proposed actions, have cumulatively significant impacts and therefore should be discussed in the same impact statement." Interior correctly maintains that the flow study was one of several related actions appropriately discussed in a single FEIS which incorporated all components of the Trinity River restoration plan and culminated in the ROD, for which the FEIS was prepared. Requiring a separate EIS for each component of a single major federal action could unduly delay and overtax governmental resources. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360–71, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

However, where, as here, most of the Agency's discussion and response to disputed issues of impacts is not presented until long after the public comment period on the DEIS closed and substantial issues were raised which were not subjected to informed public participation, the NEPA process broke down.

### c. *Inclusion of Mitigation Factors in FEIS*

Plaintiffs argue that the inclusion of mitigation factors in the FEIS did not correct the deficiency in the DEIS because the FEIS mitigation factors were taken from the two BioOps which were excluded from public scrutiny and not subjected to public comment. Plaintiffs request the ROD be set aside.

20. Interior argues section 1502.25 directs a DEIS be prepared concurrently with studies required under other environmental laws. However, the consultation that resulted in the BioOps in this case did not occur until approximately seven months after the DEIS was circulated. The discussion of mitigation measures was left up to an unspecified future study.

NEPA serves dual purposes: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835 ("It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment.") (internal quotations and citations omitted); *Northwest Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.,* 56 F.3d 1060, 1064 (9th Cir.1995) ("The purposes of an EIS are to provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process.").

Inclusion of new information in the FEIS (bypassing public input) does not automatically invalidate the FEIS. The CEQ regulations provide a procedure by which new information in an FEIS may be subjected to NEPA review. 40 C.F.R. § 1502.9(c). That procedure determines whether information is significant enough to warrant additional public comment, as part of the flexibility agencies have in responding to public concerns. *See California v. Block,* 690 F.2d 753, 771 (9th Cir. 1982) ("To effectuate [the purpose of public comment], agencies must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input.").

■ Section 1502.9(c) provides that an agency shall prepare a supplement to a draft or final EIS if: 1) there are substantial changes in the proposed action that are relevant to the environmental concerns; or 2) there are environmentally relevant, significant,[21] new circumstances or information that bear on the proposed action or its impacts. 40 C.F.R.

---

**21.** The CEQ regulations define significantly as:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate

§ 1502.9(c)(1). "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). However, "[i]f there remains major Federal action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered a supplemental EIS must be prepared." *Id.* at 374, 109 S.Ct. 1851.

 New information is significant where it "provides a seriously different picture of the environmental landscape." *City of Olmsted Falls, Ohio v. Fed. Aviation Admin.,* 292 F.3d 261, 274 (D.C.Cir. 2002); *see also Davis v. Latschar,* 202 F.3d 359, 369 (D.C.Cir.2000) ("[O]nly those changes that cause effects which are significantly different from those already studied require supplementary consideration.") (internal quotations omitted). "[T]he key to whether a Supplemental Environmental Impact Statement is necessary is ... whether the proposed [work] will have a significant impact on the environment in a manner not previously evalu-

ated and considered." *South Trenton Residents Against 29 v. Fed. Highway Admin.,* 176 F.3d 658, 663 (3d Cir.1999).

 An agency decision to forego completing an SEIS will not be set aside unless it is arbitrary and capricious. *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556 (9th Cir.2000). "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency." *Id.* (quoting *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.1993)).

Here, as discussed below, Interior decided *all* the "new" information was not significant enough to warrant a supplemental EIS or "recirculation." "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996). "[T]he agency must examine the relevant

a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856; *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir.1995).

■ In this case, Interior discussed in the FEIS whether an SEIS was necessary based on the new information. It concluded without analysis or factual support, that the new information in the FEIS was "mainly for clarification purposes and does not represent significant new information requiring recirculation." FEIS D2–71. Evaluating the significance of the new information under the "seriously different picture" standard, Interior concluded that "none of the new information in the Final EIS rises to that level." FEIS D2–72. This legal conclusion is wrong for the DEIS as to Delta–Sacramento River species, BioOp RPMs, range and substance of a reasonably integrated management alternative, and hydropower impacts, and because the DEIS deferred all these issues, the public notice and comment period closed January 20, 2000, and the FEIS issued November 17, 2000, does not take a hard look at any of the issues raised. Interior does not discuss why it believes that the "new information" is not significant and none of its responses in the FEIS analyzes the merits of new mitigation mea-

sures;[22] instead it offers an argumentative justification for avoiding supplemental considerations by its legal conclusion that all the issues raises are insignificant. Plaintiffs gave notice of concerns about impacts on such species and related issues in the public comment period. 18 AR 10653, 29 AR 17492–93, 19537–38. Because Interior did not critically examine the relevant data or articulate the basis for its decision not to supplement the EIS, which did not identify any specific mitigation measures or probable secondary effects of flow increases on Sacramento River and Delta species, but rather deferred to future BioOps and/or ESA reconsultations, the significance of this failure must be analyzed.[23]

*California v. Block* analyzes the need for a supplemental DEIS to address information discussed for the first time in an FEIS and holds that although agencies must have some flexibility in modifying alternatives contained in a DEIS, an EIS must provide the public with sufficient information to permit meaningful consideration. *Block*, 690 F.2d at 771–72. "The EIS process should serve both to alert the public of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process." *Id.* at 772.

Here the additional information, added after the DEIS was circulated, addressed mitigation factors. The DEIS does not

**22.** After describing the legal standard for determining whether an SEIS is required, the entirety of the FEIS' analysis of whether the new information requires supplementation is: The new information included in the EIS/EIR does not include anything that triggers recirculation under these standards. In particular, the final document does not reveal any new significant effects, or substantial increases in previously identified significant effects. Nor can any reviewer credibly assert that the DEIR portion of the Draft

environmental document was "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." FEIS at D2–72.

**23.** In the thematic response "Mitigation to Listed Species/ESA Consultation," Interior again simply stated that it was appropriate to "defer discussion of mitigation matters." FEIS, at D2–65.

discuss mitigation factors related to the Sacramento River and Delta ESA-listed species nor the secondary effects of increased flows on other CVP-water users. An EIS must contain a discussion of possible mitigation measures. *Robertson*, 490 U.S. at 351–52, 109 S.Ct. 1835; *Okanogan*, 236 F.3d at 473; *Neighbors of Cuddy Mountain*, 137 F.3d at 1380; *see also* 40 C.F.R. § 1502.14(f) (mitigation measures shall be included in discussion of alternatives); 40 C.F.R. § 1502.16(h) (mitigation measures required). "Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson*, 490 U.S. at 351–52, 109 S.Ct. 1835 (quoting 42 U.S.C. § 4332(C)(ii)) (internal citations omitted). "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Id.*

*Block* requires that a supplemental EIS be prepared if the public was not given sufficient information to intelligently participate in the NEPA process. *Block*, 690 F.2d at 771–72. *Robertson* holds that failure to include mitigation measures prevents the public from properly evaluating the proposed action. *Robertson*, 490 U.S. at 351–52, 109 S.Ct. 1835. Under the *Block* test, the inclusion of previously undisclosed mitigation measures is significant enough to require an SEIS.

Courts have also determined that an SEIS is required if the changes cause effects which are significantly different from those already studied. *Davis*, 202 F.3d at 369. Here, the DEIS recognized that the impact on Sacramento River and Delta ESA-listed species, salmon, Sacramento splittail, and Delta smelt, was significant, but deferred determination of any mitigation measures for future consideration. The failure to analyze, or even identify, mitigation measures to address changes that will be caused by the new flow regime and their effects, have an undetermined potential to be different from those already studied. *See Robertson*, 490 U.S. at 352, 109 S.Ct. 1835 ("An adverse effect that can be fully remedied by, for example, an inconsequential public expenditure is certainly not as serious as a similar effect that can only be modestly ameliorated through the commitment of vast public and private resources."). The omission of discussion of mitigation measures foreclosed any public input on the issues of whether and what CVP operations management alternatives existed and were feasible; and whether alternate water sources existed or if reduced flows could reduce the impact on species and other CVP users.

Two of the factors listed in 40 C.F.R. § 1508.27, that affect whether action is significant, are the likelihood that the action will be highly controversial, 40 C.F.R. § 1508.27(b)(4), and the degree to which the action may adversely affect an endangered species, 40 C.F.R. § 1508.27(b)(9). Interior knew that any decision it made relating to increased permanent Trinity River flow releases and its effects on the Sacramento and Delta ESA-listed species and secondary effects on power generators, municipal, industrial, and agricultural water users, was going to be controversial and significant within the meaning of 40 C.F.R. § 1502.9(b)(2), (3), (4), and (7). Prior to the issuance of the BioOps or the

FEIS, San Luis submitted comments criticizing the DEIS on these grounds and Westlands sent a 60–day notice of intent to sue unless formal ESA Section 7 consultation was undertaken. Interior also had specific knowledge that the new information was related to how Sacramento river and south of the Delta endangered species would be affected by increased TR flows.

Defendants' collective response in contending Interior was not arbitrary or capricious, is to ignore the absence of consideration of mitigation measures in the DEIS: their identity, significance, effectiveness, effects, and controversy over their substance and range. Any discussion was included for the first time in the FEIS without public input and used as a post hoc rationalization for the decision not to supplement the EIS on the grounds that species' and other impacts resulting from the Preferred Alternative are not significant. Applicable NEPA regulations require more, see 40 C.F.R. § 1502.9(c), and as to revised portions of the DEIS, *see* 40 C.F.R. § 1502.9(a).

Anecdotal evidence indicates Interior chose to assume the risk of apparent NEPA violations after the March 10, 2000, ESA notice. 7 AR 3865, 3894, 10 AR 20174, (Ex. A to Robinson Dec.). Interior as much as admits it could not cure the NEPA violations that had occurred as of that time.

### 2. *Effect of BioOps*

Plaintiffs argue that the ROD should be set aside because: 1) Interior failed to assess the environmental impacts of the BioOps' mitigation measures in the FEIS; and, 2) even if Interior did analyze the RPMs, inclusion in the FEIS requires an SEIS. Plaintiffs argument implicates two of the BioOps' reasonable and prudent measures ("RPMs"):

1) The USFWS' RPM:

Reclamation shall minimize the effects of reoperating the CVP resulting from the implementation of the Preferred Alternative within the Trinity river basin on listed fish in the Delta.... These terms and conditions are non-discretionary. To implement Reasonable and Prudent Measure number one Reclamation must implement the following:

● If Reclamation in its annual operations planning process detects that implementation of the Preferred Alternative will result in an upstream (eastward) movement of X2 [24] in any month between February 1 through June 30 of 0.5 km, Reclamation shall incorporate within its operating plan measures that can and will be implemented to minimize or eliminate such upstream movements.

AR 17537–38 (footnote added).

2) The NMFS' RPM:

7. In dry and critically dry water year types, Reclamation and USFWS shall work cooperatively with the upper Sacramento River Temperature Task Group to develop temperature control plans that provide for compliance with temperature objectives in both the Trinity and Sacramento rivers ...

The USFWS and Reclamation must comply with the following terms and

---

24. X2 is the water quality standard that measures salinity by the number of kilometers upstream or eastward, of the Golden Gate Bridge that water in the Sacramento–San Joaquin River Delta has an electroconductivity of 2.64 mmhos/cm. Salinity improves by moving westward when fresh water enters the Delta.

conditions, which implement the reasonable and prudent measures described above. These terms and conditions are non-discretionary.

. . . .

7.a. Be prepared to make use of auxiliary bypass outlets on Trinity Dam as needed . . . .

AR 17493–94. These RPMs were incorporated into the FEIS, pages 2–43–45, and the ROD, AR 17703.

### a. *Assessment of BioOps in FEIS*

Plaintiffs argue that the BioOps RPMs are "connected actions" that had to be considered in an FEIS and are invalid because Interior did not do so. Defendants respond that these mitigation measures were analyzed in the FEIS and that the actions are not connected.

### i. *Connected Actions*

■ Section 1508.25 of Title 40, C.F.R. defines "connected actions" as those that "are closely related and therefore should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a). Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.* The federal defendants argue that the BioOps and the EIS are not "connected actions," but are rather "a single federal action, approval of the ROD to approve fishery restoration measures." [25] Doc. 258 at 20:16–21:1. Section 1502.4(a) provides that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a). Whether the actions are "connected actions" as argued by NCPA, or "a single action" as argued by the federal defendants, the result is the same: they should be evaluated in a single EIS. The March 22, 2001 memorandum decision notes: "There is no question that the two BioOps are 'interdependent parts of a larger action,' . . . depending on implementation of the preferred alternative for their justification, because the only reason for the X2 measure is that the ROD's implementation of the FEIS's preferred alternative . . . reduces the water now flowing . . . ." Doc. 136 at 47 n. 49. The "actions" which caused the need for the BioOps are the increase of flows in the Trinity River to re-establish and maintain the fishery which results in less water reaching the Sacramento Delta. The ROD and the FEIS adopted and incorporated the BioOps' RPMs as mitigation measures. Whatever nomenclature is applied to the relationship between the BioOps' RPMs, the EIS, and the ROD, the end result is that they are inextricably intertwined as part of the same action to restore Trinity River fishery, which in turn requires they be analyzed in the same EIS.[26] Interior admits it was required to comply with NEPA and the ESA in imple-

---

**25.** It appears that this argument was made to respond to an argument that separate EISs were required for the BioOps. Plaintiffs no longer advance that argument.

**26.** This does not mean that all BioOps necessarily require NEPA review. Here the mitigation measures of the BioOps were incorporated into the FEIS and the ROD and will expect

menting § 3406(b)(23), but argues issuing the ROD, a single federal action, was not a series of connected, independent actions which required two separate FEISs. The distinctions made by the parties are without meaningful difference. Interior rejoins that the FEIS, App. D–2 at pp. 65–66, discusses impact on species and ways to minimize incidental takings. The ROD is the end result of an integrated series of actions, which did not require a separate EIS for each action.

### ii. *Central Valley Species*

The October 12, 2000, Reinitiation of Formal Consultation and Biological Opinion authored by USFWS focused on status of species including Delta smelt (AR 17518) and Sacramento splittail. (AR 17520). Analysis of the implementation of the Preferred Alternative on Delta smelt and Sacramento splittail appears at AR 17532–34 and its cumulative effects at AR 17535–36. The effects analysis focuses on temperature changes, entrainment by pumps during diversions of water, moving fish habitat upstream in times of decreased outflows, effects of toxic substances on spawning habitat, state or local levee maintenance, introduction of exotic species, wave action in water channels, degrading banks or channels, and changes in flow levels. The cumulative effects are considered "not likely" to jeopardize continued existence of the smelt or splittail or to result in the destruction or adverse modification of critical habitat. The ITS recognizes Delta smelt and Sacramento splittail may be harmed, harassed, injured, or killed by direct entrainment, but implementation of the Preferred Alternative flow levels on incidental take is expected to

remain at the level of the March 6, 1995, Biological Opinion. The USFWS RPMs do not specify what CVP operational measures will be implemented to minimize or eliminate upstream X2 movement greater than 0.5km in any month between the period from February 1st through June 30th. Reporting about take or suspected take will be continuous.

The NMFS Biological Opinion of October 12, 2000, identifies coho salmon, chinook salmon, and steelhead as Central Valley and Sacramento River endangered or threatened species, and analyzes effects of Preferred Alternative on these species at AR 17472 to 17489. Extended temperature analysis is performed using temperature criteria and reservoir carryover storage. Increased temperature violations are recognized at AR 17482 and use of Trinity Dam auxiliary outlets to improve temperature conditions by bypass operations from July to October are recommended. NFMS concludes that with auxiliary bypasses, Trinity River temperature criteria can be achieved 95% to 96% of the time without altering the timing of exports to the Sacramento River. The analysis opines that changes to X2 location under the proposed action are not likely to adversely affect winter run chinook salmon in the Delta, AR 17484, referring to Table 3–15 of the TRMFR DEIS, the upper Sacramento River, AR 17485, and reaches the same conclusion for Central Valley steelhead. AR 17485–86. The NMFS BioOp summary finds no change to temperature-related mortality of spring-run chinook salmon and steelhead, no effect in the Delta on smelt survival, and no appreciable diminution of critical habitat that affect

---

major federal action. It is the adequacy of the FEIS and the NEPA review for the ROD

that is disputed.

fish, mortality. The NMFS BioOp analyzes cumulative effects on the Central Valley species at AR 17489 and concludes at AR 17490, that the Preferred Alternative is not likely to jeopardize continued existence of any salmon species nor is it likely to destroy or adversely modify critical habitat. What the NMFS BioOp does not do is to analyze what effect on power generation the bypass alternative will have or whether there will be related CVP reoperations such as reallocation of additional CVP water.

### iii. *Were the RPMs Analyzed in the EIS?*

Plaintiffs argue that the impacts of the mitigation measures specified by the BioOps and incorporated by the FEIS were not analyzed in the EIS nor subjected to public comment. They maintain that it was impossible to do so, because the BioOps were not issued until shortly before the FEIS was released. Defendants rejoin that the mitigation measures were analyzed in the FEIS,[27] albeit without public participation.

### A. *Auxiliary Bypass RPM*

The impact of the mitigation measure to use the auxiliary bypass outlets at Trinity Dam was discussed in the FEIS. The "Powerplant Bypass" thematic response refers to temperature control benefits and costs to CVP power customers of using the auxiliary bypass outlets. FEIS at D2–79–90. Interior discussed the relation of CVP power generation to total California powers generation and demand, but does not break out Northern California effects. *Id.*

at D2–91–101. It concluded any CVP power supply was not critical to the total California electrical demand. *Id.* at D2–91–92. It is not disputed that the DEIS and public comment phase did not analyze power impacts except from a socioeconomic standpoint. 22 AR 13320.

As to temperature control ramifications, Interior relies on the upper Sacramento River Temperature Task Group "to develop future temperature controls and flows," without specific analysis of what means will be utilized to achieve temperature objectives or the resulting impacts. A nondiscretionary condition to "make use of auxiliary bypass outlets on Trinity Dam, as needed" is imposed. 27 AR 17492–494. No reference is made to whether additional CVP water will be needed for any auxiliary bypass.

The applicable "rule of reason." *Churchill County*, 276 F.3d at 1071, asks "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)). There was no public input in the discussion in the FEIS related to the impact of using the auxiliary bypass outlets. The FEIS did not need to specifically name the BioOps as plaintiffs contend, if it discussed the subject matter of the impact of the BioOps RPMs with reasonable thoroughness, however, the FEIS does not perform such an analysis.

### B. *X2 RPM*

As to the X2 RPM, the parties' arguments highlight different understandings

---

**27.** Defendants also argue that the RPMs are not as restrictive as plaintiffs imply and that the RPMs merely mandate the process Interi-

or must follow to mitigate harms to ESA-listed species and not specific actions. This argument is addressed below.

of what has to be analyzed. As defendants argue, the FEIS discussed the impact of X2 movement on Delta ESA-listed species. The Preferred Alternative does not mandate moving the measurement location for X2, nor does it change the X2 standard. It is not possible to know the effect that X2 RPM compliance will have, because defendants did not identify or analyze the impact of any mitigation measures which actually will be used to address X2 effects. Rather, defendants respond, based on USFWS and FMS input, that effects of X2 compliance are insignificant, and if X2 measures are needed, "ESA reconsultation will be reinitiated." There is no discussion of where additional water will come from, or what quantity will be needed to maintain the X2 standard within or close to 0.5km of its required location.[28] Implementation of the Preferred Alternative admittedly will affect the Sacramento River and Delta ESA-listed species to some degree. The FEIS incorporates future unspecified mitigation measures to lessen these effects. These mitigation measures in turn cause effects; impacts, direct or indirect, and their significance must be analyzed. 40 C.F.R. §§ 1502.16(a)-(b).

The RPMs only describe procedures not what specific actions Interior will actually take, or what effects such actions will have. Defendants argue that the X2 RPM "most emphatically did not require that Reclamation take any and all measures to ensure that the X2 location did not change. Instead, FWS instructed Reclamation as part of the 'operations planning process,'

to 'incorporate within its operating plan measures' that 'minimize or eliminate' upstream movement.'" Doc. 258 at 16:14–17 (Fed. Def.'s Opp'n). From this, defendants conclude, because (1) there is no qualitative difference between the existing Water Quality Control Plan ("WQCP") X2 standard and the X2 RPM and, (2) the X2 RPM only requires that Reclamation consult if there is a change greater than 0.5 km, there are no significant impacts to analyze.

Whether this failure to assess the impact of the X2 RPM violates NEPA is determined under the "rule of reason" standard; *Churchill County*, 276 F.3d at 1071, which asks, "whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974)). The thoroughness of an EIS is decided by "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.* (quoting *Block*, 690 F.2d at 761).

Plaintiffs maintain that X2 RPMs result in a de facto change in the current X2 standard under the Water Quality Control Plan ("WQCP"), which itself makes such RPMs significant. Defendants rejoin that X2 RPMs do not change the current X2 standard. Their experts say otherwise. Michael G. Thabault,[29] declares:

Section 7 of the endangered Species At of 1973 (as amended) (Act) requires the

---

**28.** An impact can be positive or negative and direct or indirect. 40 C.F.R. § 1508.8 ("Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those

resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.").

**29.** Consideration of extra-record materials is allowed in four circumstances: 1) if the material is necessary to determine whether an

Service to evaluate the effects of the actions of Federal agencies on species listed pursuant to Section 4. As part of this evaluation the Service must consider the direct, indirect, interrelated, and interdependent effects of the action, as well as including cumulative effects to listed species. This analysis must be considered in the context of the environmental baseline for the species. The environmental baseline is defined at [50 CFR § 402.02] as:

"the past and present impacts of all Federal, State, or private actions and other human activities in an action area, the anticipated impacts of all proposed Federal projects in an action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions that are contemporaneous with the consultation in process."

It is essentially the status of the health of the species at a snapshot in time. The current operation of the CVP and SWP have resulted in an environmental baseline condition that exceeds (i.e., is better for the species) the standards established in the WQCP.... The Service evaluated the effects of the Preferred Alternative on listed species and how the action may affect Reclamation's ability to maintain the environmental baseline. The Service concluded that there would be affects to the location of X2 which may effect distribution, spawning, rearing, and foraging abilities of the delta smelt. Also, reduction in flows may, at times, effect the spawning and rearing opportunities for the Sacramen-

to splittail. The Service subsequently developed a Term and Condition and associated Reasonable and Prudent Measure (RPM) that could minimize the effects, and in some instances eliminate the effects of the action, *within the confines of Reclamation's CVP operations.* (Emphasis added.)

Doc. 75 at 5:6–28. According to Mr. Thabault, the baseline against which the X2 RPM is measured exceeds the minimum X2 requirement under the WQCP. The X2 RPM provides: "If Reclamation in its annual operations planning process detects *that implementation of the Preferred Alternative will result in an upstream (eastward) movement of X2* in any month between February 1 through June 30 *of 0.5 km, Reclamation shall incorporate* within its operating plan *measures that can and will be implemented* to minimize or eliminate such upstream movements." AR 17493–94 (emphasis added). Implementation of this RPM is nondiscretionary. *Id.*

Based on its plain wording, the X2 RPM requires Interior to incorporate within its CVP operating plan measures that will minimize or eliminate eastward movement of X2 exceeding 0.5km. This requires more than consultation and goes beyond prescribing the process to be followed; it requires affirmative federal action. Mr. Thabault states that the X2 "term and condition does not modify the already stated commitment of the Bureau of Reclamation to avoid and minimize the effects to species protected pursuant to the Act by minimizing the effect of incidental take (water) as measured by X2. The term and

agency has considered all relevant factors and has explained its decision; 2) when the agency relied on the extra-record materials; 3) when supplementation is necessary to explain complex or technical subject matter; and, 4)

when plaintiffs make a showing of bad faith. *Northcoast Envtl. Ctr. v. Glickman,* 136 F.3d 660, 665 (9th Cir.1998). The first exception applies here.

condition merely sets the threshold for when those actions developed and committed to by the Bureau of Reclamation should be implemented." That is precisely plaintiffs' point; the X2 RPM creates an absolute standard defining when Reclamation must act. Mr. Thabault's declaration recognizes that the present location of the X2 from which movement is measured under the RPM already exceeds the WQCB standard.

Chester Bowling, Operations Manager of the Central Valley Operations Office for the Bureau, declares that Reclamation determined that although implementation of the Preferred Alternative would not violate the WQCP; simulations show that in some years X2 will move upstream in excess of 0.5km. Doc. 290 at ¶ 8. Other than ESA reconsultation no specific mitigation action is identified.

Plaintiffs argue that this new standard is significant, defendants argue that it is not. Mr. Bowling and plaintiffs' expert, James Snow, agree that there are months in some years in which computer simulations indicate that X2 will move upstream in excess of 0.5km invoking the X2 RPM's requirement for action. Doc. 281 at ¶ 10; Doc. 290 at ¶ 8. Specifically, the X2 will move eastward more than 0.5km in 20 percent of all Junes, and in four years, X2 will move 0.5km in more than one month. Doc. 281 at ¶ 10.

Mr. Snow calculates the cost in water to comply with the RPM in the four years where the X2 RPM standard is exceeded in more than one month, at 410,000 AF; 370,000 AF; 270,000 AF and 260,000 AF. Doc. 281. In these calculations, Mr. Snow assumed that the X2 movement was to be eliminated. However, the RPM does not require elimination, it calls for minimization *or* elimination. While it is possible

the effect of the X2 RPM may be as great as Mr. Snow opines, it is also possible that it would be significantly less. Mr. Bowling expresses his understanding that Reclamation must, in the event X2 moves upstream in excess of 0.5km, coordinate with the USFWS to determine what, if any, action is required. Doc. 290 at ¶ 7.

If changes in operations, such as additional upstream releases or reduced pumping, are necessary, Reclamation will determine if the changes are "minor." *Id.* If they are more than minor, Reclamation will request reinitiation of formal consultation with the USFWS. Mr. Bowling notes that it "is possible that the X2 RPM could require major changes in CVP operations." *Id.* Plaintiffs rely on the USFWS conclusion, that by using an Interagency team to evaluate and recommend changes in operations, "the service has concluded there will not be an adverse modification or destruction of habitat for Delta smelt." USFWS BioOp, p. 30 (80–12–00). The defendants in substance say "trust us." Yet Mr. Bowling declares, based on his experience, changes necessitated by the RPM X2 measures could include major changes in the dedication and management of (b)(2) water, in actions implemented with CALFED EWA, and that could impact available CVP operational flexibility. *Id.* at ¶ 8. Whether a major change in CVP operations will further directly impact south-of-delta water users through increased upstream releases and reduced delta pumping, or will impact other environmental programs or species through the use of the limited (b)(2) water account, remains undetermined. However, it is certain that potential major changes in CVP operations will occur in 20 percent of all Junes.

Water in the CVP is a limited resource, the right to which is constantly disputed.

There are sixteen pending lawsuits in this court, alone, in which numerous CVP stakeholders dispute their respective rights to annual CVP water allocations. Whenever CVP water is diverted to a different use, an impact is experienced throughout the system. The effects on the Preferred Alternative from the X2 RPM pose potential unquantified but significant environmental and other consequences. The conflict between USFWS' "insignificance" opinion and the Bureau's views of the FEIS's X2 RPM consequences expressed by Mr. Bowling, are not addressed or resolved by defendants, making impossible a finding that further analysis of X2 RPMs was not required. It was arbitrary and capricious for the EIS and FEIS not to address impacts of X2 RPMs and CVP re-operation.

### b. *Supplemental EIS*

■■■ Plaintiffs argue that the ROD should be set aside because Interior failed to prepare an SEIS assessing the BioOps' mitigation measure impacts, which were incorporated into the ROD and FEIS. An agency decision to forego completing an SEIS will not be set aside unless it is arbitrary and capricious. *Friends of the Clearwater*, 222 F.3d at 556. The applicable standard is whether the decision not to complete an SEIS was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency." *Id.* (quoting *Mt. Graham Red Squirrel*, 986 F.2d at 1571). "This is especially appropriate where ... the challenged decision implicates substantial agency expertise." *Id.*

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856; *O'Keeffe's*, 92 F.3d at 942. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43, 103 S.Ct. 2856; *Dioxin/Organo-chlorine Ctr.*, 57 F.3d at 1525.

■■■ Here, Interior did not articulate a satisfactory explanation for its decision not to conduct an SEIS. After the October 12, 2000, BioOp Interior did not have time to do so. It simply rationalized that the new information included in the FEIS was "mainly for clarification purposes and does not represent significant new information requiring recirculation." FEIS D2–71. FEIS D2–72. Interior does not discuss why it believes that the "new information" is not significant. The expected effects of the X2 RPM and auxiliary bypass at the Trinity Dam RPM were not considered and the reason for not doing so is implausible, which makes the action arbitrary and capricious. These RPMs must be considered in an SEIS which includes public participation.

■■■ Section 1502.9(c) provides that an agency shall prepare a supplement to a draft or final EIS if: 1) there are substantial changes in the proposed action that are relevant to the environmental concerns; or 2) there are environmentally relevant significant new circumstances or in-

formation that bear on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1). "[W]hether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains 'major Federal actio[n] to occur,' and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh*, 490 U.S. at 374, 109 S.Ct. 1851. "[T]he key to whether a Supplemental Environmental Impact Statement is necessary is . . . whether the proposed [work] will have a significant impact on the environment in a manner not previously evaluated and considered." *South Trenton*, 176 F.3d at 663.

The Bureau recognizes the X2 RPM, as described by the FEIS and the ROD, is a significant change. If the federal defendants had attempted to change the X2 standard as a separate action, an EIS would have been required. X2 has major environmental consequences, which will require CVP reoperation if its limits are exceeded under the RPM. Interior cannot circumvent the requirement that an EIS recognize and analyze a major change by inserting it into an FEIS without analysis of, or public input on, its impacts. An SEIS must be completed analyzing all effects of the X2 RPM. In at least twenty percent (20%) of all water years, the X2 standard will be violated, necessitating CVP reoperation. What will be the RPMs? Where will the water come from to address the RPMs to mitigate the condition? How much CVP water will be required and how will such water be managed? What will be the likely impacts of required CVP reoperation on south-of-Delta species and what will other impacts be on the human environment and from reallocation of CVP water among other users?

c. *Auxiliary Outlet Bypasses (Temperature and Power Ramifications)*

■ The impacts of the auxiliary outlet bypass RPM to assist temperature control objectives were discussed in the FEIS, Appendix D 29, 79–91, in response to NCPA's objection that the original Appendix F (addressing power impacts) failed to address power impacts of "auxiliary outlet releases at Trinity Dam." The question is whether the information included in the FEIS represented a "substantial change" or "significant new circumstances or information" that "provides a seriously different picture of the environmental landscape." *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 274 (D.C.Cir.2002); "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Plaintiffs argue that the impact of the auxiliary outlet bypass RPM was not sufficiently analyzed because the effect of the loss of energy on reliability of the California grid was not discussed. Plaintiffs are mistaken in part. The FEIS did cover and analyze "CVP Generation in Relation to Total California Generation and Demand." Appendix D2, 91–101. It did not do so specifically for the effect of Trinity Dam bypasses on Northern California CVP power supply and reliability.

■ Interior addressed the related issue of water temperature impacts from

bypass operations to protect Trinity and Sacramento River fisheries. NCPA's concern about bypassing the Trinity powerplant is specifically mentioned in Appendix D2, p. 81. An SEIS is required for the Trinity Dam bypass RPM because Interior did not analyze or address the measure and its impacts on Northern California power supply and reliability in the DEIS. Although the FEIS mentions the issue, it concludes without analysis, such operations will not cumulatively have adverse impacts, the unsupported conclusion is a post hoc rationalization. A hard look was required but not taken.

### 3. *Analysis of Preferred Alternative Effect on Power System Reliability*

The DEIS was published in October 1999 and the public comment period extended through January 20, 2000. All plaintiffs submitted comments. No public comments were permitted by Interior in the NEPA process after January 20, 2000. On June 28, 2000, the California Independent System Operator ("ISO") declared a Stage One Electrical Emergency[30] for the third consecutive day. On August 3, 2000, the ISO declared a Stage Two Electrical Emergency for the fourth consecutive day, as part of a California energy crisis.

On August 23, 2000, the U.S. Department of Energy's Western Area Power Administration ("WAPA") wrote to Interior providing notice that Interior's impact analysis for the Trinity River EIS and the CVPIA Programmatic EIS ("PEIS") only "focused on the potential economic impacts to CVP power." AR 3923. It went on to state that "[t]hese impacts were studied with the implicit assumption that long-term power system reliability would not be a concern." *Id.* WAPA communicated its "belief it was prudent to re-examine the work conducted in order to assess potential reliability impacts." *Id.* WAPA's letter evaluated reliability impacts: from June to October of an average year, on-peak energy reductions would range from 27,000 MWh to 47,000 MWh compared to the No–Action alternative; in a dry year the reduction ranged from 2,000 MWh in October to 79,000 MWh in July. *Id.* at 3923–24. WAPA concluded: "During the critical summer months, the data indicates that as much as 124 MW of capacity supported with energy may be lost in September (of an average year) and up to 324 MW may be lost in July (of a dry year), as a result of reoperating the CVP to meet the requirements associated with both the PEIS and the Trinity River EIS/EIR." *Id.* at 3924. This power impact was characterized as "striking" by the Department of Energy. *Id.* at 3924.

On October 20, 2000 Interior published the FEIS. Five days later Interior rescinded the FEIS Notice of Availability and republished the FEIS November 17, 2000. On December 7, 2000 the California ISO declared a Stage Three Electrical Emergency. On December 10 and 11, 2000 the ISO declared Stage Two Electrical Emergencies. On December 14, 2000, the Department of Energy ("DOE") declared an energy emergency in California and ordered electrical generation facilities to generate and transmit electric energy when and in such amounts as requested by

---

**30.** A Stage One Electrical Emergency occurs when operating reserves fall below 7 percent. A Stage Two Electrical Emergency occurs when operating reserves fall below 5 percent.

A Stage Three Electrical Emergency occurs when operating reserves fall below 1.5 percent. Rolling blackouts can occur during Stage Three Electrical Emergencies.

the ISO.[31] On December 19, 2000 the ISO declared a Stage Two Electrical Emergency and invoked its powers under the December 14, 2000 DOI order. On the same day, the Secretary of the Interior signed the ROD implementing the Preferred Alternative.

On January 17, 2001, the ISO declared a Stage Three Electrical Emergency followed by rolling blackouts January 17, 18, and March 19 and 20, 2001. The ISO declared a Stage One Electrical Emergency July 9, 2002, and a State Two Electrical Emergency on July 10, 2002.

Plaintiffs argue that the ROD should be set aside because the FEIS does not realistically assess the impacts of the Preferred Alternative on power system reliability, requiring an SEIS. Defendants assert the FEIS and DEIS did analyze power system reliability and that no SEIS is required.

### a. *Discussion of Power Impacts in FEIS*

The FEIS contains a section in its Power Analysis Thematic Response entitled "CVP Generation in Relation to Total California Generation and Demand." Appendix D2, 91–101. In this section, the FEIS opines that TRD-generated power produces capacity to supply approximately 1 percent of current California demand and will account for less than 1 percent of the projected 2010 demand. D2, 91–2. It also states that although demand growth has outstripped supply growth, completion of additional powerplants is anticipated to help avoid electrical emergency alerts in

the future. The power generators argue "detailed assessment" of the impact of CVP power supplies on the greater California region was not conducted for the DEIS/EIR, other than presented in the socioeconomics section. 22 AR 13320, 13888.

The ROD states that "operating criteria will be developed" to allow WAPA to respond to emergencies per obligations to the North American Electric Reliability Council and Presidential Memo, of August 3, 2000, providing federal agencies work with California to develop backup power generation for power shortage emergencies. The thematic response concluded that: "[i]t is anticipated that as demand for power increases, additional power supplies will be built to meet the increase in total California demand. As this occurs, the CVP's current total contribution of meeting 4 or less percent of total California electrical demand will constitute a decreasing proportion of the state's overall power generation supply." FEIS, D2–92.

Other than this discussion, the only information that relates to the California energy crisis is the analysis included in both the DEIS and FEIS about the extent of decrease in power production under the various options to the State as a whole. This discussion was not related to system reliability, but to socioeconomics. The ROD results in decreased value of CVP power production of $5,564,000 annually under the Preferred Alternative, a 3% decrease of $9,024,000 annually. ROD at p. 22. Appendix F to the DEIS addresses power impacts as does Table 3–49 to the

---

**31.** Janice Schneider, the former Counselor to the Deputy Secretary of the Interior at the U.S. Department of the Interior, declares that she prepared a briefing paper, dated December 17, 2000, for the Secretary of the Interior discussing, *inter alia*, ongoing developments in the power markets in California. 27 AR 17676–89, Schneider Dec., Ex. L to filed Doc. 73. This cannot substitute for NEPA review.

FEIS. See also TRFEFR, Appendix A, p.A.–12, Table 4, p.A.–17, which review the 1981 Secretarial Decision. The FEIS discusses the California power crisis; the issue is whether Interior took a "hard look."

EIS review is under the "rule of reason" standard; *Churchill County,* 276 F.3d at 1071: "Under this standard, we ask 'whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Id.* (quoting *Trout Unlimited,* 509 F.2d at 1283). To determine whether an EIS is reasonably thorough, courts must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." *Id.* (quoting *Block,* 690 F.2d at 761).

When deciding NEPA claims, a court may not impose its own notion of which procedures are best. *Id.* at 1072. Instead, a court's role is to insure the agency has taken "a hard look." *Id.* "[NEPA] is not meant to 'mandate particular results' but to provide a process to ensure that federal agencies take a 'hard look' at the environmental consequences of proposed acts. When an agency makes a decision subject to NEPA's procedural requirements, 'the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive....'" *Tillamook County,* 288 F.3d at 1143–44 (quoting *Strycker's Bay Neighborhood Council,* 444 U.S. at 227, 100 S.Ct. 497). Courts must strictly interpret the procedural requirements of NEPA "'to the fullest extent possible' consistent with the policies embodied in NEPA." *Churchill,* 276 F.3d at 1072. Pro forma compliance is not enough. *Id.*

█ Interior was informed by WAPA that Interior's previous analysis of the power impacts was based upon an assumption that was no longer valid. Further analysis was recommended. WAPA provides its own analysis in its letter that discusses the impacts of the Trinity River EIS and the FEIS. Interior responded to the WAPA letter, with a "memorandum to file" to document its position on the California power crisis: "in 1999, all of the power generated by the Trinity River Division (TRD) relative to the total of recent power consumption in California shows that the TRD accounted for less than 0.70% than [sic] the total consumption and the change in power generated would result in an average decrease of 0.041% in an average water year, before accounting for new generating capacity." AR 17676. It noted that although implementation of the Preferred Alternative would result in only insignificant effects on power generation within California, the ROD must include a direction to Interior and WAPA to develop coordination measures to allow for increased generation of power during periods of critical shortfalls in California. AR 17677. Interior addressed WAPA's concerns, determined that the impact of implementing the Preferred Alternative on the California energy crisis was minimal, but provided the ROD include a condition to develop measures for increased power generation during critical periods of energy shortfall. None of this additional "consideration" was subject to public participation.

Interior took a look at the issue. Title 40 C.F.R. § 1502.14 requires the look be reasonably thorough. Interior cannot be required to adopt measures other stakeholders believe are prudent, except if reason and science make the agency's choice arbitrary, capricious, or unlawful. Interior does not provide an analysis of the net effect of power impacts on Northern Cali-

fornia in implementing the Prepared Alternative. Its process thwarted public participation and informed decision-making on power capacity and reliability issues. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1992). Although Appendix D responds to many issues raised by the power generator plaintiffs, ultimately, Interior's finding that the Preferred Alternative's effect on California power generation from the CVP will be minimal and that its response to power emergency situations will comply with the Presidential Memo of 8/3/00, cannot be tested based on the AR. A "hard look" at relevant power supply and reliability consequences requires an SEIS.

The power generator plaintiffs also argue that the DEIS analysis of the Preferred Alternative did not focus on its impact on power system reliability. Not surprisingly, the electricity power grid in California is a function of power supply and demand. The government submits a declaration from Mr. Marcus, responding to Mr. Dame's declaration on behalf of the power generator plaintiffs. Even if both declarations are considered because they aid in understanding the complex and technical issues surrounding the way in which hydroelectric power generating capacity of the CVP is affected by the Preferred Alternative, both as it relates to state-wide power demand and Northern California power demand, such information needed to be part of the NEPA review. Defendants point to Appendix F and attachment F1, which analyze the impact of the Trinity River alternatives on the balance between power supply and demand, as evidence the capacity issue was considered. The analysis includes changes to CVP supply (project capacity) and CVP demand (project use) and considers the effect of dry-year monthly ca-

pacity changes. The DEIS observes that peak power loads occur in summer months, which are most sensitive to reduced capacity. Additional months, January—March and December are also periods of increased power use. The DEIS concludes the Preferred Alternative would increase dry year capacity on the average 6.5 Mw over the No Action Alternative. The most ·significant month, December, shows a reduction of capacity by 85 Mw, in excess of the 50Mw level of significant change in capacity, which is provided for in the FEIS and ROD by an emergency provision. Contrary to Plaintiffs' assertion, Interior did consider evolving circumstances as pertinent to power generation and reliability, revised the ROD accordingly, but acknowledged regional and local effects require further analysis. 27 AR 17676–89, 17691–92; May 23, 2002, California energy Commission letter.

Extra-record references are made to a briefing memo prepared for the Secretary of the Interior as of December, 2000, and California Energy Commission Scoping Comments, which identify 2592 Mw of new power generating capacity in operation (not dependent upon hydro power) and another 13,867 Mw of power generation capacity under construction, 3,213 Mw of which are expected to be operational by the end of 2002. An additional 9,980 Mw of power generation capacity are in licensing. Marcus Dec. ¶ 21, California Energy Commission Comments pp. 6–7. The experts do not agree. Their differing opinions reflect contrary scientific viewpoints that do not require a choice. Interior's conclusion that negative impacts on power generation capacity will be offset by resource development may be valid, however, it was not subjected to public scrutiny.

*Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 558 (9th Cir.2000), involved a

10 year old, out-of-date EIS. Here the lawsuit was initiated upon completion of the FEIS and before the ROD was signed. Interior should have performed an SEIS to address the effect on Northern California power supply and reliability resulting from implementation of the Preferred Alternative in view of major changes associated with the California energy crisis.

### b. Supplemental EIS re: Energy Impacts

An agency decision to forego completing an SEIS will not be set aside unless it is arbitrary and capricious. *Friends of the Clearwater*, 222 F.3d at 556. The court must consider whether the decision not to complete an SEIS was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* "Review under this standard is to be searching and careful, but remains narrow, and a court is not to substitute its judgment for that of the agency." *Id.* (quoting *Mt. Graham Red Squirrel*, 986 F.2d at 1571). "This is especially appropriate where ... the challenged decision implicates substantial agency expertise." *Id.*

The FEIS discusses the impact of implementing the Preferred Alternative on the developing California energy crisis. The agency determined that "in 1999, all of the power generated by the Trinity River Division (TRD) relative to the total of recent power consumption in California accounted for less than 0.70% of the total consumption and the change in power generated would result in an average decrease of 0.041% in an average water year, before accounting for new generating capacity." AR 17676. Interior decided that despite the seriousness of the 2001 energy crisis, it was not a significant new circumstance because any reduction in energy produc-

tion which would be caused by implementation of the Preferred Alternative would be so small. Interior's determination that the 2001 California energy crisis was not a sufficiently significant factor as to require a supplement to the DEIS, can only be overturned if it was a clear error in judgment. A court may not substitute judicial judgment for that of the agency.

 The information in the FEIS is not sufficient to permit informed analysis of the ultimate effects of the California energy crisis. All the information bearing on the analysis is extra-record and has been submitted in the form of conflicting declarations in the lawsuit. The CVP makes an allegedly "minor" contribution to the annual California energy supply and implementing the Preferred Alternative is alleged to have less than a 0.05% effect on the California power supply. Interior's view that ongoing new development of California power generation capacity will ameliorate reduction in CVP power generation capacity caused by implementing the ROD is not challenged. Defendants' extra-record arguments about evolving knowledge of alleged market fraud and manipulation by power suppliers in 2000–2001 were not known or available to Interior in December 2000 and cannot be considered.

Even though supplemental analysis would likely favor Interior's position that CVP power supply impacts are not significant, for the additional reason that the California power shortages were, in some measure, caused by fraud and market manipulation, the Administrative Record has not been supplemented. Even if the parties' declarations are considered for technical assistance, they are not dispositive. "The complete record" does not assuage the concerns about significant change wrought by the energy crisis or the need for an SEIS on the power effects issue.

Plaintiffs' motion for summary judgment on the issue of the federal defendants' failure to comply with NEPA based on analysis of the Preferred Alternative's effect on power system supply and reliability is GRANTED. The federal defendants' motion on the same issue is DENIED.

### 4. Timing of EIS and the Trinity River Flow Evaluation Final Report

Plaintiffs argue that an FEIS should have been completed on the TRFES before the final report on the study was published. Resolution of this issues raises two questions: 1) was the Trinity River Flow Evaluation Final Report ("TRFEFR") a major federal action; and, 2) if so, was the FEIS prepared in a timely manner.

#### a. Major Federal Action

NEPA requires that an EIS be prepared for all "major federal actions." 42 U.S.C. § 4332(2)(C). "*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (emphasis in original). It includes, *inter alia*, "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future agency actions will be based." *Id.* at 1508.18(b)(2).

The first seven chapters of the TRFEFR include the introduction, background, historical perspective, study approaches, results, and restoration strategies. Chapter Eight is entitled "recommendations." The executive summary of the TRFEFR describes the purposes of each chapter. Chapter 8

contains recommendations "to utilize an Adaptive Environmental Assessment and Management (AEAM) approach to guide future management and ensure the restoration and maintenance of the fishery resources of the Trinity River" and to use "instream flow, channel-rehabilitation, and fine and course sediment" recommendations in order to implement Chapter Seven's "conclusion that a modified flow regime, a reconfigured channel, and strategy for sediment management are necessary to have a functioning alluvial river ... that will provide the diverse habitats required to restore and maintain the fishery resources of the Trinity River." TRFEFR at 227, 230. The summary of the recommendations chapter also describes the integration of these three primary actions: "Rehabilitation of the mainstem Trinity River and restoration and maintenance of its fishery resources requires (1) increased annual instream volumes and variable reservoir release schedules, (2) fine and coarse sediment management, and (3) mainstem channel rehabilitation." *Id.* at 233. The first of these recommendations are the increased flows adopted in the DEIS, FEIS, and ROD.

CVPIA Section 3406(b)(23) required Interior to complete the TRFES and make recommendations to Congress and the Hoopa Tribe for permanent instream fishery flows by fall 1996. The government cannot plausibly argue that the TRFEFR, which compiled all the data regarding the Trinity River restoration and recommended a modified flow regime that reallocates up to over 815,000 AF of CVP water to the Trinity River, does not constitute a recommendation on a proposal for major federal action. Doc. 136 at

42:21–43:1. Section 3406(b)(23) directs that the Secretary make recommendations for increased flows. After forwarding the recommendations to Congress, the Secretary had two options: 1) to concur; or, 2) not to concur. If the Secretary and the Hoopa Valley Tribe (with whom the Secretary must consult on the TRFES) concurred, the recommendations were to be implemented. The recommendations of the TRFEFR were designed to guide how Interior uses federal resources; and future agency action was likely to be based upon these recommendations.[32] The TRFEFR constitutes the "[a]doption of [a] formal plan[ ], such as [an] official document[ ] prepared or approved by [a] federal agenc[y] which guide[s] or prescribe[s] alternative uses of federal resources, upon which future agency actions will be based." *See* 40 C.F.R. § 1508.18(b)(2). This is major federal action; Interior recognized its responsibility to prepare an EIS and did so.

### b. *Timeliness of EIS Preparation*

CEQA regulations address the time for EIS preparation. "An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation *can be completed in time for the final statement to be included in any recommendation or report on the proposal.* The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5 (emphasis added). "Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal." 40 C.F.R. § 1508.23.

Here, the draft TRFEFR (a report on a proposal) was released in January 1998 and the final TRFEFR was published in June 1999. Four months later, in October 1999, the DEIS was released. The public comment period on the DEIS extended to January 20, 2000. On March 29, 2000, Interior forwarded the TRFEFR to Congress pursuant to CVPIA § 3406(b)(23). Eight months later, on November 17, 2000 the FEIS was published. On December 18, 2000, the Hoopa Valley Tribe concurred in the TRFEFR's recommendations and on December 19, 2000, the Secretary and the Hoopa Valley Tribe signed the ROD.

Section 3406(b)(23)'s requirements made the flow recommendations in the TRFEFR a critical decisionmaking point. Once the Secretary made recommendations in the TRFEFR, the Tribe could concur in them (and they would be implemented), or not concur, which would leave flows at the statutory minimum level (340,000 AF) pending further legislative or judicial action. The point in time at which the Secretary had the broadest discretion to determine flow levels was the point at which

---

**32.** The federal defendants cite *Churchill,* 276 F.3d at 1075 for the proposition that a "court has no authority to ... determine a point during the germination process of a potential proposal at which an impact statement should be prepared." *Id.* (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). However, they omit the next sentence: "A final EIS is required only at the time the agency 'makes a recommendation or report on a proposal for federal action.' " *Id.* The TRFEFR was a recommendation and report for federal action.

the TRFEFR recommendations were made. That was the point in time at which the FEIS should have been completed so that the EIS could have had an effect on the decisionmaking.[33] The government argues an FEIS was not required before the TRFEFR was submitted to Congress because it was a programmatic and project-specific EIS. FEIS pp. 1–3.

"NEPA procedures must insure that the environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b); *Northwest Res. Info. Ctr.*, 56 F.3d at 1064 ("The purposes of an EIS are to provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences and to provide the public with information and an opportunity to participate in the information gathering process."). The FEIS was not prepared before the Final Flow Recommendations were submitted to Congress. All components of the Flow Study and Restoration Plan were incorporated into the ROD and the FEIS. When the TRFEFR was submitted in March 2000, Congress had the DEIS, but not the FEIS. It was not required that a separate EIS be completed at every stage of the project. At least two of Plaintiffs' major concerns, power impacts and Integrated Management Alternative were not fully considered in the DEIS provided to Congress. A related contention, that Interior improperly narrowed the range of alternatives considered to meet the initial 1996 statutory deadline is treated below. 2 AR 632, 659.

### 5. *EIS Alternatives*

Plaintiffs complain the EIS violated NEPA because it did not examine a reasonable range of alternatives and that the ROD must therefore be set aside. This argument has four premises: 1) the various laws applicable to the management of the CVPIA and the restoration of the Trinity River require that *only* enough water be devoted to accomplish Trinity River fishery restoration as *necessary* and no more; 2) based on this interpretation of the governing law, Interior failed to consider a reasonable range of alternatives; 3) an "Integrated Habitat and Fishery Management" alternative is an important reasonable alternative, used on other rivers, that must be considered; and, 4) the EIS unlawfully constrained the range of options by concentrating on increased water flows and channel restoration to ignore any integrated management alternative that incorporated non-flow management measures.

### a. *Statutory Mandate*

Plaintiffs argue that CVPIA "general" provisions in Sections 3402 and 3406 limit Section 3406(b)(23) water releases to only

---

**33.** The federal defendants argue that a separate EIS was not required for the TRFEFR because it and the ROD were connected actions. 40 C.F.R. § 1508.25(a)(2) ("Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement ...."). There is no question they are related; the only question is when the EIS should have been prepared. Section 1502.5 states, the FEIS must be completed in time to "serve practically as an important contribution to the decisionmaking process...." The primary decisionmaking here occurred at the time the TRFEFR made its flow and related recommendations, not when the Secretary concurred with the ROD. The ROD was signed one day after the tribe concurred in the TRFEFR.

the amount necessary to achieve the restoration purposes of the 1984 Act and "to the extent restoration reasonably can be accomplished by means other than flows, the Secretary must at least consider utilizing such other means," but did not do so. (Emphasis in original). Doc. 233 at 17:11–14 (SMUD motion).

### i. *Statutory History*

The Trinity River Division was authorized in 1955 by Public Law 84–386 ("1955 Act"). "For the principal purpose of increasing the supply of water available for irrigation and other beneficial uses in the Central Valley of California, the Secretary of the Interior, acting pursuant to the Federal reclamation laws . . ., is authorized to construct, operate, and maintain, as an addition to and an integral part of the Central Valley Project, California, the Trinity River division . . ." Pub.L. No. 84–386, 69 Stat. 719 (1955). Section 2 of the 1955 Act provides:

> Subject to the provisions of this Act, the operation of the Trinity River division shall be integrated and coordinated, from both a financial and an operational standpoint, with the operation of other features of the Central Valley Project, as presently authorized and as may in the future be authorized by Act of Congress, in such manner as will effectuate the fullest, most beneficial, and most economic utilization of the water resources hereby made available: *Provided, that the Secretary is authorized and directed to adopt appropriate measures to insure the preservation and propagation of fish and wildlife,* including, but not limited to, the maintenance of the flow of the Trinity River below the diversion point at not less than one hundred and fifty cubic feet per second . . .

*Id.* at § 2 (emphasis added). The Senate Report on the 1955 Act notes that the "development of the Trinity River was planned with a view to maintaining and improving fishery conditions . . . and requires that the project be operated so as to insure the preservation and propagation of fish and wildlife." S.Rep. No. 84–1154, at 5 (1955); H. Rep. No. 84–602, at 4 (1955).

In 1984, Congress passed the Trinity River Basin Fish and Wildlife Management Act ("1984 Act") to restore fish and wildlife populations to pre-TRD levels. The 1984 Act found "the construction of the Trinity River division of the Central Valley Project in California, authorized by the Act of August 12, 1955 (69 Stat. 719), has substantially reduced the streamflow in the Trinity River Basin thereby contributing damage to pools, spawning gravels, and rearing areas and to a drastic reduction in the anàdromous fish populations . . . ." Pub.L. No. 98–541 § 1(1) (1984). It recognizes the 1955 Act directed the Secretary of the Interior "to take appropriate actions to ensure the preservation and propagation of such fish and wildlife." *Id.* at § 1(3). In order to restore the fish populations to the levels approximating those that existed immediately prior to TRD construction, the Secretary was directed to formulate and implement a fish management program that would include the following components:

(1) The design, construction, operation, and maintenance of facilities to—

 (A) rehabilitate fish habitats in the Trinity River between Lewiston Dam and Weitchpec;

 (B) rehabilitate fish habitats in tributaries of such river below Lewiston Dam and in the south fork of such river; and

 (C) modernize and otherwise increase the effectiveness of the Trinity River Fish Hatchery.

(2) The establishment of a procedure to monitor (A) the fish and wildlife stock on a continuing basis, and (B) the effectiveness of the rehabilitation work.

(3) Such other activities as the Secretary determines to be necessary to achieve the long-term goal of the program.

*Id.* at § 2(a).

In 1992, Congress enacted the CVPIA. Pub.L. No. 102–575, 106 Stat. 4600 (1992):

(a) to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;

(b) to address impacts of the Central Valley Project on fish, wildlife and associated habitats;

(c) to improve the operational flexibility of the Central Valley Project;

. . . .

(f) to achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

Pub.L. No. 102–575, § 3402 (1992).

Section 3406(a) amended the CVP Authorization Act of August 26, 1937 by, *inter alia*, inserting the following sentence: "The mitigation for fish and wildlife losses incurred as a result of construction, operation, or maintenance of the Central Valley Project shall be based on the replacement of ecologically equivalent habitat. . . ." It also added the mitigation, protection and restoration of fish and wildlife as one of the purposes of the CVP.

CVPIA Section 3406(b) addresses fish, wildlife, and habitat restoration. It begins with a general statement that: "The Secretary . . . shall operate the Central Valley Project to meet all obligations under State and Federal law, including but not limited to the Federal Endangered Species Act, 16 U.S.C. 1531, et seq., and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project." *Id.* at § 3406(b). It then lists twenty-three specific actions the Secretary is to take.

Section 3406(b)(23) provides that an instream flow of not less than 340,000 AF of water shall be released each year from the Trinity River Division for the purposes of fishery restoration, propagation, and maintenance. Section (b)(23) directs the Secretary to complete the TRFES "in a manner which insures the development of recommendations, based on the best available scientific data, regarding permanent instream fishery flow requirements and Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." Pub.L. No. 102–575 § 3406(b)(23)(A). Section (b)(23)(B) directs the Secretary to forward the TRFES to Congress and if the Secretary and the Hoopa Valley Tribe concur in the TRFES' recommendations, to implement the instream fishery releases to meet the fishery restoration goals of the 1984 Act. Section (b)(23) has an express, further purpose to meet federal trust responsibilities to the Hoopa Valley Tribe.

In 1996, Congress amended the 1984 Act. Congress directed that Trinity River restoration was to be measured not only by returning adult anadromous fish spawners, but also by the ability of dependant tribal, commercial, and sport fisheries to participate fully, through in-river and ocean harvest opportunities, in the benefits

of the restoration. Pub.L. No. 104–408 (1996). Congress added language that amended the activities that were to be undertaken by the Secretary. *Id.* The original language directed the Secretary to "modernize and otherwise increase the effectiveness of the Trinity River Fish hatchery." The 1996 Act added "so that it can best service its purpose of mitigation of fish habitat loss above Lewiston Dam while not impairing efforts to restore and maintain naturally reproducing anadromous fish stocks within the basin." *Id.* Contrary to the EIS management team's scope definition, the restoration of the TR fishery goes beyond the Trinity mainstem fishery to fish stocks within the Trinity River basin and to habitats in tributaries and the south fork of that river below Lewiston Dam. § 2(a)(1)(B).

### ii. *Plaintiffs' "Only Enough Necessary" Argument*

Plaintiffs argue the various laws applicable to CVP management and TR restoration require that *only* enough water be devoted to TR restoration as *necessary* and no more. Specifically, they contend that CVPIA sections 3402(f) and 3406(b) require balancing all the competing interests of CVP water users and such balancing necessarily limits the amount of CVP water restored to Trinity River. Section 3402 and the prefatory provisions of Section 3406(b) are general provisions, controlled by the more specific provisions found in the subsections of Section 3406(b). *Westlands,* 43 F.3d at 461–62. Section 3406(b)(23) directs that the TRFES be

completed and that it make recommendations, based on the best available scientific data, for permanent fishery flow requirements. The volume of flows is to be determined by the Secretary.

What water is necessary for restorative instream flows is not a subject to be second-guessed by a court unless Interior's decision is arbitrary, capricious, or unlawful.[34] *Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 576 (9th Cir.1998) ("[W]here an issue requires 'a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.' ") (quoting *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851). SMUD argues that the limited alternatives considered, impermissibly constrained Interior from formulating and analyzing a multi-purpose alternative: restore the fishery and secondarily protect the needs of all other CVP users. Citing *Greenpeace v. Nat'l Marine Fisheries Serv.,* 55 F.Supp.2d 1248 (W.D.Wa.1999) (EIS/R that did not evaluate as an alternative, integrated total allowable fish catch with other management measures; such as location and timing of fishery, year types and groupings, product quality, habitat alteration, and markets, prevented decision-makers from making fully informed choice).

SMUD's fourth and fifth claims assert Interior abdicated its obligations under the CVPIA and other federal reclamation law to manage the Trinity River division for multiple purposes to effectuate the most beneficial and economic utilization of Trinity River water; to meet requirements of

---

34. Reference to the 1984 Act does not change this. Section (b)(23) incorporates the 1984 Act's goal to restore fish and wildlife populations to pre-TRD levels. The means selected to achieve this goal were rehabilitation of the Trinity River mainstem and tributaries, and increased hatchery production to replace lost habitat below Lewiston Dam. The CVPIA addressed another means of achieving the 1984 Act's goal, i.e., increased flows. The 1996 amendment of the 1984 Act expands the scope and standard of restoration.

the 1984 TR Management Act; and to achieve reasonable balance among multiple interests that depend on CVP water. CVPIA § 3406(2)(f). The first assertion that permanent annual flow volumes cannot be "scientifically justified" is not supported by science or history. The Trinity River has been actively studied for over 20 years and the proposed implementation of flow volumes to restore the river is variable to the extent of the water year class. Habitat restoration focuses on channel rehabilitation efforts.

The ROD's permanent variable annual aggregate flow volume is fixed without regard to actual future experience. Interior is the manager of the CVP and has discretion to determine the timing and volume of water releases throughout the water year; to incorporate additional objectives beyond restoring and maintaining the fishery; i.e., to meet reservoir storage requirements; management of peak flows for hydropower production, flood control releases to serve safety; and to manage annual available CVP water supply to satisfy contractual obligations. The adoption of finite annual aggregate flow release volumes to be retained within the Trinity Basin is rationally related to the Bureau's management function to restore the fishery and facilitates planning and annual publication of available water from all CVP storage reservoirs.

Choosing a new flow regime that divides approximately 50% of Trinity River flows north of Lewiston Dam between the Trinity and Sacramento River Basins, instead of the historical average of 75% to 90% diversion to the Sacramento Basin and south, since TRD completion in 1964, is not per se irrational, arbitrary, or capricious to implement the congressional mandate to restore and maintain the Trinity

River fishery. The adopted schedule retains approximately 48% of Trinity River water for restoration in the Trinity mainstem between Lewiston Dam and Weitchpec, with 52% released to the Sacramento River Basin for the benefit of Central Valley species and users, including SMUD. The restoration standard has been set to approximate pre-TRD conditions. The ultimate NEPA issue centers on whether the intentional narrowing of the EIS purpose to concentrate on increased water flows and channel rehabilitation prevented the decision-maker and the Court from assessing the utility of a variable flow alternative that uses non-flow measures to serve all the statutory objectives of the 1984 Act as amended, the CVPIA, and the secondary purposes of minimizing effects on all other CVP water users.

### iii. *Legal Interpretation at EIS Purpose*

SMUD recounts the dispute over the purpose of the EIS that developed within the Management Team. In essence, the view that prevailed was based on a legal interpretation of the 1984 Act and the CVPIA, separating the CVPIA flow minimums and final study requirements to the exclusion of P.L. 98–541's requirement to modernize and otherwise increase the effectiveness of the Trinity River hatchery as part of the broad objective to formulate and implement a fish and wildlife management program for the Trinity River basin to restore fish and wildlife populations to the levels approximating those which existed immediately prior to the start of construction of the Trinity River Division.

Contrary to the constricted EIS purpose used, the 1984 Act, Pub.L. 98–541, § 1(5), 99 Stat. 2721 (October 24, 1984) directed a "[Trinity River] Basin-wide fish and wild-

life management program," to be achieved by formulating and implementing a plan to restore fish and wildlife populations to pre-Trinity River Division levels. The October 30, 1992, CVPIA mandated minimum annual 340,000 AF flows "to meet the fishery restoration goals" of the 1948 Act and a completed Trinity River Flow Evaluation Study by December 1996, through recommendations for permanent instream fishery flow requirements and Trinity River Division Operating Criteria and Procedures to restore and maintain the Trinity River fishery. § 3406(b)(23)(A). Unambiguous statutory language requires permanent Trinity River restoration flows and TRD operating criteria and procedures. The 1984 Act was reauthorized in 1996 by statutory amendment.

As a matter of statutory interpretation, the CVPIA specific minimum flows and direction to formulate permanent TR restoration flows and TRD operating criteria and procedures, take precedence over more general language of the 1984 Act. *Edmond v. United States*, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997); *In re Padilla*, 222 F.3d 1184, 1192 (9th Cir.2000) (where specific and general statute addresses same subject matter, specific takes precedence regardless of sequence of enactment and must be applied first). However, the '84 Act goal of achieving pre-TRD levels of fish and wildlife in the Trinity Basin, not just the Trinity River mainstem, was not repealed or modified and was re-emphasized and further defined in the 1996 Act. The CVPIA includes a balancing of competing demands

for use of CVP water objectives, which, although secondary to the more specific restoration goals of (b)(23), should have been given consideration in the NEPA review because (b)(23) also refers to the '84 Act as restoration authority. The management team's pre-litigation legal interpretation, narrowing the EIS purpose, is entitled to no judicial deference, because it is not reasonable and ignores the additional statutory goals of improving not only the mainstem, but also tributaries and south fork, and balancing competing CVP uses. The CVPIA does not narrow the legislative purpose of Trinity River restoration, which remains basin-wide, and does not include only the TR mainstem between Lewiston Dam and Weitchpec.

### b. *Range of Alternatives*

Plaintiffs argue that Interior's EIS did not consider a sufficient number of different alternatives. This issue turns in part on the purpose of the EIS, which, according to Interior, is "to carry out the Congressional directive in subsection (b)(23) of the CVPIA to assess environmental issues, alternatives and impacts associated with the restoration of natural production of anadromous fish on the Trinity River mainstem downstream of Lewiston Dam." Aug. 20, 2002 hearing at 6:1–6 (Mr. Shockey).

SMUD agrees that the EIS's purpose is to restore anadromous fish in the Trinity River and that the directive is to accomplish this goal by increased flows,[35] as (b)(23) provides for permanent instream

---

**35.** "SMUD does not disagree with the federal defendants or the Tribes that the purpose as stated, as Mr. Shockey points out, stated on the first page of the EIS, was to restore the anadromous fishery in the mainstem of the Trinity River. SMUD does not disagree that

taken together, the statutes amount to a federal directive to accomplish this goal by way of increased flows into the Trinity mainstem." Aug. 20, 2002 hearing at 11:9–17 (Mr. Saxton).

fishery flow requirements. SMUD argues that the range of alternatives, to achieve this purpose was too narrow and arbitrary because lower flows could have been recommended if non-flow restoration measures were integrated with flow measures. SMUD complains the TRFES wrongfully adopts an "ecological perspective philosophy" which abandons basin-wide considerations to concentrate on maximized fixed flow requirements which prevent applying integrated management measures to address constantly changing hydrological conditions.

The Water Districts argue that Interior improperly substituted the statutory goal of restoring the fishery with a "dynamic alluvial river objective." [36] Aug. 20, 2002 hearing at 18:5 (Mr. O'Hanlon). The water districts' argument is essentially that added "river objectives" are not required in the selection of alternatives.[37] They argue this caused Interior to only consider flow-related alternatives to the exclusion of an Integrated Management Alternative proposed by SMUD's expert. This part of the controversy centers on the "restore and maintain a 'healthy' Trinity River in part by establishing 'healthy river' objectives based on 'known and presumed attributes of the pre-dam Trinity River.'" DEIS 1, 12–13.

### c. *Legal Interpretation of EIS Purposes*

SMUD points to the early dispute over the purpose of the EIS that developed within the EIS Management Team. The approach that prevailed was based on the team's legal interpretation of the 1984 Act, CVPIA, and 1996 Act, that separated the CVPIA flow minimums and final study requirements, to the exclusion of the '84 and '96 Acts' broader purposes, which include an integrated 16–point Trinity River Fish and Management program covering water flows, sediment management, tributaries rehabilitation, hatchery modification, and stream and land use management. The adopted EIS purpose also rejected the statutory direction to modernize and otherwise increase the effectiveness of the Trinity River hatchery as part of the broad statutory objective to formulate and implement a fish and wildlife management program for the Trinity River basin, (AR 27289) which would restore the fish and wildlife populations in the basin to the levels approximating those which existed immediately prior to the start of construction of the Trinity River Division.

SMUD points to letters and memoranda evidencing that legal advisors to the EIS management team intentionally narrowed and limited the scope and content of the EIS to ultimately focus only on increased flows and channel restoration of the mainstem Trinity River below Lewiston Dam and Weitchpec, purposefully ignoring the rest of the Trinity River basin, tributaries, south fork, and impacts on other CVP uses and users. In intentionally limiting the scope of the EIS, the EIS managers rec-

**36.** SMUD also made this argument in their papers, but did not raise it at oral argument when asked to identify the purpose of the EIS.

**37.** The stated purpose of the EIS is to "restore and maintain the natural production of anadromous fish on the Trinity River mainstem downstream of Lewiston Dam." DEIS at 1–4. However, in addition to this purpose the EIS had the goal of restoring and maintaining

a "'healthy' Trinity River mainstem downstream of Lewiston Dam" which was further defined by the establishment of "qualitative 'healthy river' objectives." *Id.* This goal "established a framework for the DEIS." *Id.* Besides ten "healthy river" goals there are goals related to the salmonid population restoration, Trinity County, and CEQA compliance.

ognized time was short and they improperly sought to attenuate the range of alternatives considered to restrict public participation and to permit completion of the ROD within the then-perceived 1996 time deadline.

SMUD further argues that by seizing on the reference to "natural" fish restoration, which appears in (b)(23) the legal advisors manipulated the EIS' focus to ignore Trinity River Fish Hatchery improvements, measures other than flow releases, and improperly locked-in an excessive permanent flow regime adopted by the ROD, ignoring non-flow alternatives as additional means to achieve restoration. Defendants acknowledge that the ROD relies on experimental, untested methodology, which "will be evaluated in the future." (AR 623, 587–90, 92–94, 623–24, 632, 636–37, 639–40, 643, 652, 661, 733, 770, 778, 804–07).

SMUD asserts no deference is owed to the pre-litigation legal position here taken by Interior, even if it interprets legislation the agency implements. *Gilliland v. E.J. Bartells Co., Inc.*, 270 F.3d 1259, 1262 (9th Cir.2001) (litigation position entitled to deference only if reasonable). Ultimately, the narrowing and limitation of the alternatives considered to increased permanent flows, channel restoration, minor watershed protection, consisting of sediment-control measures already in place and road de-commissioning, resulted in an EIS that did not adequately or honestly consider whether an integrated management alternative, based on stream restoration science presently utilized by Interior that integrates multiple approaches to fishery restoration that would take into account the overall effect on other CVP users.

SMUD contends that the ROD is arbitrary and capricious because its recommended permanent flows are hypothetical,

untested, and unreliable. No matter what actual experience and adaptive management proves, the ROD has permanently locked-in and prohibits change in flow volumes below its established minimum flows for each annual hydrologic year-type. Interior neither explains nor analyzes the failure to consider an integrated management alternative with secondary objectives to minimize impacts on other CVP users.

### i. *The Law*

An EIS must discuss reasonable alternatives to a proposed action. *American Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186, 1201 (9th Cir.1999); 42 U.S.C. § 4332(2)(C)(iii). Section 1502.14 of the CEQ regulations requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives," to include a "no action" alternative, and a preferred alternative. 40 C.F.R. § 1502.14. However, agencies are not required to include "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). "The range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project." *Laguna Greenbelt, Inc. v. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir.1994).

When determining whether a reasonable range of alternatives was considered, the "touchstone" is whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir.1990) (quoting *Block*, 690 F.2d at 767). NEPA does not require the consideration

of alternatives: whose effect cannot be reasonably ascertained; whose implementation is remote or speculative; which are infeasible, ineffective, or inconsistent with basic policy objectives; or which are not significantly distinguishable from alternatives actually considered, or; which have substantially similar consequences. *Id.* at 1180–81. However, "an agency cannot define its objectives in unreasonably narrow terms" to restrict the range of reasonable alternatives. *City of Carmel–By–The–Sea v. Dep't of Transp.,* 123 F.3d 1142, 1155 (9th Cir.1997). The "rule of reason" guides both the choice of alternatives and the extent to which an EIS must discuss each alternative. *American Rivers,* 201 F.3d at 1201.

Interior observes it has concurrent discretion to determine how best to restore the Tribes' reserved fishing rights in the Trinity River as part of the express federal trust obligation to the Indian Tribes, in part defined in the 1996 amendment of the 1984 Act. *Parravano v. Babbitt,* 70 F.3d 539, 542 (9th Cir.1995).

### ii. *Alternatives Considered*

The DEIS identified four alternatives to meet the statutory purpose, goals, and objectives: 1) Maximum Flow, dedicating all Trinity River flows above Trinity Dam to fishery restoration; 2) Flow Evaluation, utilizing managed flows and mechanical rehabilitation; 3) Percent Inflow reducing released water into the Trinity River at forty per cent of the rate it flows into the Trinity Reservoir; and 4) Mechanical Restoration, using mechanical means to alter the river channel and create fish protection habitat. DEIS at 2–1. In addition to these four alternatives, measures including "No Action," "maintaining the status quo," and "State Permit," reducing annual 340,-

000 AF flows to 120,500 AF, the level specified in Interior's 1959 water permits, were also analyzed. *Id.* The State Permit Alternative was analyzed as a standard against which to compare other alternatives, because it is the baseline for state permitting purposes. *Id.* However, it is not viable as it calls for flows less than the statutory minimum.

The Maximum Flow Alternative "would use all of the Trinity River inflows above Trinity Dam to restore the river ecosystem through managed flows, which would include periodic peak flow releases." DEIS at 2–11. No mechanical restoration would be carried out. *Id.* at 2–12. The Flow Evaluation Alternative is based on the TRFES recommendations. *Id.* at 2–16. Forty-seven mechanical rehabilitation projects would be constructed under this alternative. *Id.* at 2–21. The Percent Inflow Alternative "would approximate natural flow patterns, at a reduced scale, by releasing water into the Trinity River at a proportion of the rate it flows into Trinity Reservoir." *Id.* at 2–22. The water released would approximate 40 percent of the previous week's inflow. This option would include the same mechanical channel restoration projects as the Flow Evaluation Alternative. *Id.* at 2–25. The Mechanical Restoration Alternative maintains instream flows at 340,000 AF/year and depends on mechanical means to restore the fish population. *Id.* at 2–26. It would include watershed protection measures, forty-seven channel rehabilitation projects, and dredging of ten potential pools. *Id.* at 2:29–30. The State Permit Alternative would reduce the flows to 120,500 AF/year as specified in Reclamation's state water permits. *Id.* at 2–31. No mechanical restoration projects would be undertaken. *Id.* The No Action Alternative "represents ongoing activities and operations" and re-

flects conditions in the year 2020. *Id.* at 2–4. It assumes ongoing watershed protection measures will continue and that current habitat improvement projects and programs, including the maintenance of twenty-seven existing channel rehabilitation projects, will also continue. *Id.* at 2–7–8.

In addition to the alternatives discussed in the DEIS, the agency severally considered and discussed, but rejected without detailed analysis, the following measures: 1) removal of Trinity and Lewiston Dams; 2) harvest management; 3) fish passage facilities; 4) trucking fish around the dams; 5) predator control; 6) increased hatchery production; 7) pumped storage; and, 8) channel augmentation using Weaver Creek. DEIS at 2–35–42. Removal of the dams was not considered viable because of environmental impacts and foregone benefits and costs. The Harvest Management Alternative was rejected because habitat, and not the number of spawning adults, was the limiting factor in natural production of anadromous fish. Even with harvesting restrictions and increased spawning escapement, natural fish production declined. *Id.* at 2–39. The Predator Control Alternative was rejected for the same reason. *Id.* at 2–40. Increased hatchery production was rejected because it did not increase the number of "naturally" reproducing anadromous fish. *Id.* at 2–41. SMUD complains it was error to separately analyze and reject each management measure as a stand-alone alternative and not as an integrated plan.

The Preferred Alternative was the Flow Evaluation Alternative with additional watershed improvements described in the Mechanical Restoration Alternative. DEIS at 2–3. The Preferred Alternative was selected using six screening criteria:

1) substantially increases natural production of anadromous fish on the Trinity River; 2) substantially restores both inriver and ocean fishing opportunities; 3) improves tribal access to trust resources; 4) balances environmental and social impacts; 5) allows for continued operation of the TRD; and, 6) limits flooding. *Id.*

iii. *Were Sufficient Alternatives Considered?*

Plaintiffs contend the EIS too narrowly focused on alternatives designed to increase flows, improve habitat and summarily rejected alternatives that could not by themselves restore fish populations.

A. *Focus of EIS*

Plaintiffs complain the lead agencies exclusively focused on alternatives designed to alter the geomorphic environment of the Trinity River. The purpose of the EIS is to "restore and maintain the natural production of anadromous fish on the Trinity River mainstem downstream of Lewiston Dam." Plaintiffs are correct that the alternatives analyzed by the EIS are all directed at restoring the mainstem Trinity River fish habitat below Lewiston Dam. For instance, harvest management was rejected because the preliminary analysis showed that limited habitat, not harvest restrictions, was the reason for the fishery's decline. "The results of the analysis indicated that although spawner escapement increased due to increasing harvest restrictions, natural production, as indicated by the production index, actually decreased.... The lack of a positive response (i.e., increase in production) with increasing harvest restrictions was due to the current quantity and quality of anadromous fish habitat in the Trinity River." DEIS at 2–39. Predator control was re-

jected for the same reason. *Id.* at 2–40. Increased hatchery production was rejected because "[e]vidence shows that increasing hatchery production can significantly impair efforts to restore and maintain naturally reproducing fish stocks." *Id.* at 2–41.

Agencies are not required to consider options that conflict with basic policy objectives. *Headwaters,* 914 F.2d at 1180–81. Here, the purpose of the EIS was to restore "naturally" reproducing anadromous fish in the Trinity River mainstem downstream of Lewiston Dam, not just increase fish population. In addition, the 1996 Act limited the use of hatchery production by requiring that it not impair efforts to restore and maintain "naturally" reproducing anadromous fish stocks in the basin. Pub.L. No. 104–143, at § 3(c). SMUD complains that science recognizes that integrated management applied in combination in limited degrees, including hatchery production, harvest management and predator control, will enhance fishery restoration efforts while affording protection to other CVP uses. Interior has the discretion not to use such measures as stand-alone alternatives; however, Plaintiffs are correct that Interior did not take a hard look at, or consider in depth, a fully integrated management alternative that reduced variable flow increases in conjunction with other management prescriptions. Because NEPA requires fair consideration of reasonable (feasible) alternatives, including discussion of the alternatives and opposing viewpoints, to avoid undue narrowing of the means of achieving the purpose of an EIS, an SEIS should have been prepared. *City of Carmel–By–The–Sea v. U.S. Dept. Transp.,* 123 F.3d 1142, 1155 (9th Cir.1997); cited in *American Rivers v. F.E.R.C.,* 201 F.3d 1186, 1200 (9th Cir. 1999).

### B. *Rejection of Stand–Alone Alternatives that Could Not Restore Fish Populations*

Plaintiffs complain the EIS considered each potential restorative alternative standing alone without combining them into an Integrated Management Plan. Specifically they object that the Harvest Management and the Hatchery Management alternatives were not combined with lower flows in a separate alternative. To the extent this argument is related to these two specific alternatives, they have been discussed.

### C. *Integrated Management Alternative*

Plaintiffs argue, based on the post-ROD expert opinion of Dr. Hanson, that an Integrated Management Alternative was essential to reasonableness of the range of alternatives; should have been analyzed as a reasonable alternative; and failure to do so was arbitrary, capricious, or unlawful. Plaintiffs point to the 1984 Act which directs the Secretary to take an integrated approach to restoring the Trinity River. However, the disputed EIS is not the first EIS on the Trinity River restoration. An EIS was completed in 1983 on the Trinity River Basin Fish and Wildlife Management Program. DEIS at 1–12. The 1984 Act was passed to give the Secretary the authority to implement that plan. Pub.L. No. 98–541, at § 1(6). This followed Interior's Solicitor's opinion, citing legislative history, that the 1955 Act authorized the Permit, and required instream flow needs in the Trinity River Basin to be met before water was exported.

The current EIS evaluates and analyzes the mechanical river restoration projects and the TRFES' recommendation and al-

ternatives.[38] Interior objects to SMUD's Integrated Management Alternative claiming it was not presented in the NEPA public comment period; *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 551–53, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), yet nonetheless responds on the merits. The declaration of Dr. Hanson is considered to aid the Court in understanding applicable river restoration science and to assist the evaluation whether Integrated Management alternative was reasonable and should have been considered and discussed.

When determining whether a reasonable range of alternatives was considered, the "touchstone" is whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Headwaters,* 914 F.2d at 1180. NEPA does not require the consideration of alternatives whose effect cannot be reasonably ascertained; whose implementation is remote or speculative; which are infeasible, ineffective, or inconsistent with basic policy objectives, or; which are not significantly distinguishable from alternatives actually considered or which have substantially similar consequences. *Id.* at 1180–81. However, "an agency cannot define its objectives in unreasonably narrow terms" to avoid a range of reasonable alternatives. *City of Carmel–By–The–Sea,* 123 F.3d at 1155. The EIS should analyze and consider the "full spectrum." The "rule of reason" guides the choice of alternatives. *American Rivers,* 201 F.3d at 1201.

The plaintiffs argue that the EIS had to consider an alternative that restored TR

anadromous fish while minimizing the effect on competing CVP uses. Plaintiffs' proposed Integrated Management Alternative involves: "(1) instream and watershed habitat protection; (2) instream and watershed habitat restoration and improvement; (3) hatchery management and stock supplementation; (4) predator control; (5) inland and ocean harvest; (6) water quality control; and, (7) land management within the watershed and along the stream channel corridor, as well as other elements." Doc. 236 at ¶ 4 (Hanson Decl.). SMUD's comments on the DEIS raised 67 points. App. D3–2579 to 2646. Interior responded to each, either directly or by reference in thematic responses included in the FEIS, but as stand-alone measures, not as an integrated plan.

SMUD's proposed alternative combines increased flows with a variety of mechanical restoration measures. The Preferred Alternative does combine increased variable annual flow releases from Lewiston Dam, coarse sediment introduction, mechanical channel rehabilitation and adaptive management, which includes watershed protection. All alternatives were analyzed assuming that the current fish population management programs would continue. The relevant statutes and Interior's preliminary findings limit the applicability of harvest management and hatchery management. Ultimately, plaintiffs seek the absolute minimum increase of flow and a greater proportion of mechanical restoration and watershed management through hatchery and harvest management, predator control and other non-flow means, in contrast with the Preferred Al-

---

**38.** In 1993, the USFWS and Trinity County began an Environmental Assessment ("EA") to evaluate the channel rehabilitation projects. In July 1994, the Secretary mandated that an EIS be prepared to evaluate any new channel rehabilitation projects as well as the TRFES' recommendations and any reasonable alternatives. The current EIS was the result.

ternative. Interior disagrees and supports its opposing view with the Trush, ¶ 4, and Polos declarations. The latest input purports to respond to plaintiffs' proposed alternatives, but not in the context of NEPA public comment to permit informed decision-making. The absence of public participation, full consideration, or discussion in the NEPA process of an Integrated Management Alternative, that sought to minimize impacts on other CVP users, requires an SEIS.

### D. *Method of Selection*

Plaintiffs assert the method used to select the Preferred Alternative preordained the alternative chosen. Specifically, Interior used the Trinity River System Attribute Analysis Methodology ("TRSAAM") to create the Preferred Alternative and then applied it to choose among options which included only one viable choice, the Preferred Alternative.

The fishery restoration analysis in the EIS used the same "healthy river" attributes employed by the TRFES. However, the EIS analyzed the alternatives not only against those attributes, but other criteria as well. The Preferred Alternative was selected using six screening criteria: 1) substantially increases natural production of anadromous fish on the Trinity River; 2) substantially restores both in river and ocean fishing opportunities; 3) improves tribal access to trust resources; 4) balances environmental and social impacts; 5) allows for continued operation of the TRD; and, 6) limits flooding. DEIS at 2–3. Although Plaintiffs do not contend that the screening criteria used are arbitrary or irrational, nor that each criteria does not serve the statutory fishery restoration purpose; they maintain no realistic alternative was provided.

### E. *Reasonableness of Alternatives*

Plaintiffs argue the only viable alternative analyzed was the Flow Evaluation Alternative, because the other "reasonable" alternatives were "strawmen." The EIS identified four "reasonable alternatives:" Maximum Flow; Flow Evaluation; Percent Flow, and; Mechanical Restoration, along with a no action alternative. Eventually a combination of the Flow Evaluation and the Mechanical Restoration alternatives was selected as the Preferred Alternative. Plaintiffs contend the alternatives wrongfully focused solely on increased flows and flow-related measures to the exclusion of non- or reduced-flow alternatives.

The Maximum Flow Alternative would release all water that flows into the Trinity River above Lewiston Dam. Plaintiffs argue that this is a "straw" alternative because it is the functional equivalent of removing the Dam, which was rejected prior to analysis by the agency. All water that enters the reservoir would be released under this alternative, so the only difference between it and Trinity Dam removal is that the dam would remain in place. Interior determined removal of the dams was impractical because of environmental impacts, foregone benefits, and removal costs. Some of these concerns are the same as those raised by the Maximum Flow Alternative, but the costs related to the two alternatives are not co-extensive. While the Maximum Flow Alternative is at the end of the spectrum of reasonableness, it evaluates conditions under maximum potential flow condition.

Plaintiffs maintain the Percent Flow and Mechanical Restoration alternatives were not viable because they could not meet the ten attributes of a healthy river. The ten attributes of a healthy river were not the

only criteria which drove selection of the Preferred Alternative. While the Flow Evaluation Alternative may have had an advantage under the healthy river criteria, other issues were considered. The Mechanical Restoration Alternative incorporates physical improvements to the river to maximize beneficial effects on fish habitat.

Plaintiffs suggest the Percent Flow Alternative was a "strawman" because it could not be implemented based on the statutory requirement that a minimum of 340,000 AF of water be released into the Trinity River each year. Section (b)(23) provides that "[i]f the secretary and the Hoopa Valley Tribe concur in these recommendations, *any increase to the minimum Trinity River instream* fishery releases established under this paragraph and the operating criteria and procedures referred to in subparagraph (A) shall be implemented accordingly." The Percent Flow Alternative does not meet the 340,000 AF minimum in dry and critically dry years.[39] At oral argument, the federal defendants argued that this did not make the option unreasonable because the Secretary could change the alternative by requiring that mandatory minimum flows be released during dry and critically dry years. The point of the EIS is to inform the public and the Secretary of the reasonable alternatives available and the impacts of those alternatives. A Percent Inflow Alternative that included 340,000 AF in dry and critically dry years is different from one that does not have this requirement. An EIS alternative that is inconsistent with and violates a statutory minimum flow mandate is not reasonable, because it assumes a flow condition that could not be imple-

mented absent Congressional action to amend the CVPIA. This alternative was not reasonable because it could not be implemented.

### F. Lower Flow Evaluation Alternative

Plaintiffs argue that the EIS itself suggests a lower flow alternative exists. The TRFEFR lists ranges of water flows that could possibly achieve the healthy river objectives. The report selected a number from within this range. Plaintiffs argue that there should have been more than one flow evaluation alternative analyzed in the EIS based on these numbers, i.e., one that was at the lower end of the range.

"[A]n agency's consideration of alternatives is sufficient if it analyzes an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters,* 914 F.2d at 1181. Alternatives that are not significantly distinguishable from an alternative already considered need not be analyzed. *Id.* The ranges contained in the TRFEFR are for peak flows in the various water year types. The difference between the lowest number in the range and the number selected by the TRFES is: 3,000 cfs in extremely wet years; 2,500 cfs in wet years; 1,000 cfs in normal years; 800 cfs in dry years, and; 200 cfs in critically dry years. These peak flows are to run for five-days under all water year types except in critically dry years in which the peak flow would run for 36 days. The total difference between the amount analyzed under the Flow Evaluation Alternative and the lowest possible flow alternative suggested by plaintiffs is 15,000 cfs in extremely wet years; 12,500

---

**39.** Under the Percent Inflow Alternative 165,-000 AF would be released in critically dry

years, and 325,000 AF would be released in dry years. DEIS, at 2–25.

cfs in wet years; 5,000 cfs in normal years; 4,000 cfs in dry years, and; 7,200 cfs in critically dry years. In aggregate terms, the increased flow volumes serve purposes in addition to fishery restoration and maintenance, including flood control, reservoir storage limits, and dam safety.

### G. Conclusion—Range of Alternatives

■ Upon close analysis, Interior in actuality considered three options for Trinity River fishery restoration: The Maximum Flow Alternative (the maximum increase in CVP water to the Trinity River); the Flow Evaluation Alternative (mid-range alternative), and; the Mechanical Restoration Alternative (the minimum amount of water). This range of alternatives consisted of two extreme endpoints and one mid-range alternative, which pre-ordained the selection. Plaintiffs argue that there should have been more mid-range alternatives considered, i.e., at the least an alternative that utilized Integrated Management methods, including non-flow measures, based on available science and existing fishery restoration methods used in the Lower Mokelumne River Management Plan, the joint CALFED/SJRMP San Joaquin River Fishery Technical Team Workshop Report and other restoration planning on the Sacramento–San Joaquin Rivers and Delta. Such an analysis would have permitted a hard look at Plaintiffs' contention that an Integrated Management approach would best serve the interests of the Trinity River fishery, the CVP, and all other CVP stakeholders.

Considering only one reasonable alternative prevented "selection and discussion of alternatives [to] enable informed decision-making and informed public participation." *Headwaters*, 914 F.2d at 1180;

*California v. Block*, 690 F.2d 753, 766–67 (9th Cir.1982). The selection criteria used to chose the Preferred Alternative, a flow-driven regime in the TR mainstem, which purposefully avoided restoration by non-flow methods, even if reasonably calculated to achieve the statutorily defined objective was premised on an unduly, narrowly-defined EIS purpose. Other reasonable options exist, as SMUD suggests lower flows combined with increased mechanical restoration, fishery management, predator control, harvest management, and related measures should have been the subject of a hard look. At oral argument the federal defendants raised another option, the Percent Inflow Alternative with the dry and critically dry year flows at the 340,000 AF floor.

The range of alternatives considered was not adequate. Developing fish passage facilities, trucking fish around dams, predator control, a pumped storage project and channel augmentation at Weaver Creek were considered, individually, and rejected as stand-alone measures under the soporific, such consideration achieved "clarity," DEIS 2:2–3; Interior also avoided analysis of "measures that would be addressed by other natural resource agencies." FEIS D3:2587. DEIS 2, 35–42, FEIS App. 2, 49. The inclusion of one mid-range option with two relatively unrealistic alternatives dictated the option selected. Plaintiffs' contention that the EIS should have been prepared with multiple purposes which included gauging permanent increases of CVP water allocated to the Trinity River to minimize impacts on all other CVP users has merit. Interior was required to take a hard look at such a reasonable alternative and it did not.

Ultimately, the amount of water permanently rededicated to the Trinity River to

achieve fishery restoration is committed to the joint discretion of Congress, Interior, and the Tribes to be implemented under Interior's CVP management operational discretion. Interior's Preferred Alternative and ROD adopt a permanent and immutable dedication of CVP water to the Trinity River Mainstem, without the searching and objective analysis NEPA requires. If Interior is wrong, the permanent flows cannot be changed without Congressional action, if such flows are excessive or unnecessary. Harm is visited upon other CVP interests when water is reallocated. Although Interior did consider mechanical channel restoration, watershed restoration, and "adaptive management," the public and all other CVP stakeholders were entitled to have their input timely considered and to have Interior take a hard look, at the least, at a multiple purpose alternative that integrated restoration management methods with secondary objectives set forth in the restoration statutes. The failure to do so violates NEPA.

Plaintiffs' motion for summary adjudication on the issue of the federal defendants' failure to reasonably scope the purpose of the EIS and to comply with NEPA based on the unreasonably narrow range of alternatives considered is GRANTED. Defendants' cross-motion on the issue is DENIED.

## C. *ENDANGERED SPECIES ACT*

Section 7 of the ESA, 16 U.S.C. § 1536, requires that federal agencies "in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency

... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical, unless such agency has been granted an exemption...." 16 U.S.C. § 1536(a)(2). When an agency requests formal consultation under Section 7(a)(2), a formal report, called a biological opinion, is prepared giving the USFWS's or the NMFS's[40] opinion about whether the agency action is "likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(h). "Jeopardize the continued existence of" means engaging in "an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. If jeopardy is likely, the report is called a "jeopardy biological opinion." 50 C.F.R. § 402.14(h)(3). If the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the report is called a "no jeopardy biological opinion." *Id.*

A jeopardy opinion must consider, and if lawful include, reasonable and prudent alternatives ("RPAs"). 16 U.S.C. § 1536(b)(3)(A) ("If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and

---

**40.** The CFR regulations apply to both the USFWS and the NMFS. The regulations use the term "Service" to describe both agencies.

50 C.F.R. § 402.02 ("Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.").

can be taken by the Federal agency or applicant in implementing the agency action."); 50 C.F.R. § 402.14(h)(3). RPAs are "alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action; that can be implemented consistent within the scope of the Federal agency's legal authority and jurisdiction; that [are] economically and technologically feasible; and, that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or result[ ] in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

Where the USFWS or NMFS concludes the agency action and any resultant incidental take [41] will not violate Section 7(a)(2) of the ESA, the Service must include within the opinion an incidental take statement that, *inter alia*, specifies reasonable and prudent measures ("RPMs") that are necessary or appropriate to minimize such impact. 16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R. § 402.14(i). The incidental take statement (ITS) must also specify "the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the [RPMs]." 50 C.F.R. § 402.14(i)(1)(iv). RPMs are "actions ... necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take." 50 C.F.R. § 402.02. "Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2).

The issuance of biological opinions, RPMs and ITSs by Interior through the FWS, is final agency action under 16 U.S.C. § 1536, subject to judicial review. Challenges to agency action under the ESA are governed by the APA. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir.2001). An agency's decision may not be overturned by the court unless it is arbitrary and capricious. *Id.* "As long as the agency decision was based on a consideration of relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action." *Id.*

Plaintiffs argue that the federal defendants committed two ESA violations: 1) the USFWS BioOp unlawfully mandates major changes in CVP operations, even if the Trinity River restoration actions will not jeopardize any listed species; and, 2) the NMFS BioOp arbitrarily mandates the implementation of the ROD's instream flow releases in the absence of lethal take of Trinity River fish. Westlands contends NEPA compliance was required before biological opinions issued which authorized incidental take of Sacramento winter-run chinook salmon, Sacramento splittail, and delta smelt, citing *Ramsey v. Kantor*, 96 F.3d 434, 437, 444 (9th Cir.1996). Defendants correctly cite *Southwest Center for Biological Diversity v. Keasse*, CV–S–97–1969 GEB JFM (E.D.Cal.1998), which holds that FWS is not required to file NEPA documents every time it issues a biological opinion or an incidental take statement. *Id.* (*Ramsey* characterized the § 7 ITS as the "functional equivalent" of a § 10 permit).

### 1. USFWS Biological Opinion

The USFWS BioOp is a "no jeop-

---

41. "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."

50 C.F.R. § 402.2. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

ardy opinion." AR 17536.[42] After determining that the Preferred Alternative will not jeopardize listed species, the BioOp included, as required, an incidental take statement. The following RPM was a part of the incidental take statement:

> Reclamation shall minimize the effects of reoperating the CVP resulting from the implementation of the Preferred Alternative within the Trinity river basin on listed fish in the Delta.... These terms and conditions are non-discretionary. To implement Reasonable and Prudent Measure number one Reclamation must implement the following:
>
> > ● If Reclamation in its annual operations planning process detects that implementation of the Preferred Alternative will result in an upstream (eastward) movement of X2 in any month between February 1 through June 30 of 0.5 km, *Reclamation shall incorporate* within its operating plan *measures that can and will* be implemented to *minimize or eliminate such upstream movements.*

AR 17537–38 (emphasis added). Contrary to the government's contention that no requirement exists that Interior prevent upstream movement of X2, the need to control movement of X2 has the potential to require major changes in CVP operations with corresponding significant impacts.[43] The parties do not dispute that an RPM may not mandate major changes. 50 C.F.R. § 402.14(i)(2) ("*Reasonable and prudent measures,* along with the terms and conditions that implement them, cannot alter the basic design, location, scope,

duration, or timing of the action and *may involve only minor changes.*") (emphasis added). An agency's action may be set aside if it is not in accordance with the law. *In re Transcon Lines,* 89 F.3d 559, 563 (9th Cir.1996). The USFWS exceeded its authority in mandating the X2 RPM because it was not legally authorized to require implementation of an RPM that would result in the major changes Mr. Bowling recognizes reoperation of the CVP will necessitate in twenty percent of all water years. Interior provides no analysis of what the X2 RPMs will be or their consequences in those years. The X2 RPM is a major change that cannot lawfully be adopted by a BioOp without NEPA compliance.

Defendants also note that the RPM calls for FWS and the Bureau to work cooperatively in dry and critically dry years "to develop temperature objectives in the Trinity and Sacramento Rivers", which will "not mandate any operational changes." This is directly contradictory to Mr. Bowling's opinion that major changes in CVP operations will be needed in short water years, which are 20% of water years. Plaintiffs' summary adjudication motion as to the X2 RPM in the USFWS BioOp is GRANTED, this RPM must be set aside. The federal defendants' motion on this issue is DENIED.

### 2. *NMFS Biological Opinion*

Plaintiffs argue that there are three problems with NMFS' BioOp: 1) under the ESA, RPMs can only be mandated if there was a finding of "incidental take"

---

**42.** "After reviewing the current status of the delta smelt, splittail, the environmental baseline, and the cumulative effects, it is the Service's biological opinion that the proposed action is not likely to jeopardize the continued existence of these species, or result in the destruction or adverse modification of critical habitat for delta smelt." AR 17536.

**43.** *See* Chester Bowling statement, *infra.*

and that NMFS did not make such finding; 2) even if there was a finding of incidental take the RPMs are not reasonably calculated to reduce the take related to gravel placement; and, 3) the RPMs cannot mandate the implementation of the action upon which the consultation is based.

### a. *Finding of Incidental Take*

■ The NMFS may only impose RPMs when there is evidence that the agency action will result in a "take." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1246 ("[A]n Incidental Take Statement must be predicated on a finding of an incidental take."). "Without evidence that a take would occur as a result of [the agency's action], issuing an Incidental Take Statement imposing conditions on the otherwise lawful use of land was arbitrary and capricious." *Id.* at 1246. "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.2. "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

■ The NMFS BioOp found:

The NMFS does not anticipate that implementation of the proposed flow schedules will incidentally take any SONCC coho salmon. The NMFS does anticipate that SONCC coho salmon habitat adjacent to and downstream of the 47 channel rehabilitation projects

may be temporarily degraded due to localized turbidity and potential fine sedimentation of channel substrate during construction activities. However, the amount of habitat temporarily degraded due to these localized effects is negligible compared to the long-term creation of additional suitable habitat along approximately 40 miles of the Trinity River. Although placement of spawning gravel in the Trinity River may temporarily displace (harass) an unknown number of juvenile coho salmon to alternative habitats, this is not expected to result in lethal take of these fish.

AR 17491. Plaintiffs argue that the NMFS findings do not show that the coho salmon would be "harmed" by implementation of the ROD. Defendants argue that the NMFS BioOp made a finding that ROD construction activities would result in either "harm" or "harassment." [44]

### i. *Harm*

Harm is defined as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

Plaintiffs opine NMFS did not find that any coho salmon would be killed or injured by the proposed action; citing NMFS' conclusion that "[a]lthough there may be minor, short lived adverse effects to juvenile coho salmon as a result of the gravel sup-

---

**44.** Defendants also argue in a footnote that plaintiffs do not have standing to raise the ESA issue. In *Bennett v. Spear,* 520 U.S. 154, 157–77, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Supreme Court found that irriga-

tion districts, which received water from a federal water project and would be effected if the proposed RPAs were implemented, had standing to sue under Section 7 of the ESA.

**1224**

plementation projects, long-term results such as improved spawning habitat, improved salmonid over-wintering habitat, and a net increase in aquatic insect production in the immediate and downstream areas are expected to provide survival benefits to Trinity River coho salmon populations." AR 17478. Plaintiffs are correct that NMFS found that implementation of the Preferred Alternative would benefit coho salmon as a whole. However, they confuse the benefit/harm to the coho salmon population as a whole with the benefit/harm to individual members of the species.

The NMFS found that the Preferred Alternative would not result in jeopardy, i.e., that the species as a whole would not be harmed. However, it also found that the mechanical restoration measures of the Preferred Alternative might "kill" individual members of the species. "*Reduced egg to fry survival* may occur as a result of fine sediment deposition downstream of a project site." [45] AR 17477.[46] An incidental take statement and RPMs are concerned with reducing the number

of individuals effected by the action, not the survival of the species as a whole.

ii. *Harassment*

"Harass" as included in the definition of "take" is not defined by statute, but legislative history describes Congress' intent: "[Take] includes harassment, whether intentional or not. This would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." H.R. Rep. 93-412, at 11 (1973). NMFS has not defined the meaning of "harass," however the USFWS has. The USFWS defines "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

The NMFS found: "[c]oho salmon fry and possibly late outmigrating smelts may

---

**45.** Plaintiffs argue, relying on *Arizona Cattle Growers' Ass'n*, that there is no evidence that the fish are in the areas of the mechanical restoration projects and therefore there can be no finding of incidental take. This argument is specious. *Arizona Cattle Growers' Ass'n* found that where there was no evidence that an ESA-listed species was found on allotments, which were approximately 30,000 acres in size, the USFWS could not mandate RPMs to prevent incidental take. *Arizona Cattle Growers' Ass'n*, 273 F.3d 1229. *Arizona Cattle Growers' Ass'n* also found that where surveys found an ESA-listed fish "throughout" a river that ran for approximately 3.5 miles in or adjacent to the allotment, the inclusion of an incidental take statement was not arbitrary and capricious. The Ninth Circuit did not require actual proof that fish were present exactly where they would be impacted by cattle on the allotment. It is not disputed here that coho salmon are found

throughout the Trinity River below Lewiston Dam, nor that they are migratory fish.

**46.** The NMFS also found: "Alternative rearing habitats may not be as productive in terms of food or cover availability, and increased competition may occur for these resources *resulting in decreased coho salmon fitness and survival rates.*" AR 17478. However, this statement was contradicted later in the BioOp: "Although placement of spawning gravel in the Trinity River may temporarily displace (harass) an unknown number of juvenile coho salmon to alternative habitats, this is not expected to result in lethal take of these fish." AR 17491. Despite the contradiction about the lethalness of the gravel supplementation process, the NMFS still found that the fitness of displaced fish would be reduced and that there could be a reduced egg to fry survival rate due to the sedimentation.

be displaced from the gravel deposition site due to the placement of gravel into the river and/or the noise from heavy machinery. Displaced juveniles are expected to seek alternative downstream or upstream habitats for rearing." AR 17477–78. The NMFS also found "[a]lthough placement of spawning gravel in the Trinity River may temporarily displace (harass) an unknown number of juvenile coho salmon to alternative habitats, this is not expected to result in lethal take of these fish." AR 17491. The disruption of coho salmon to the extent that they migrate to another area of the river is sufficient to rise to the level of "harassment." This is so even if the disruption is temporally limited. "Take" is concerned with the effect on individual species members, not necessarily on the survival of the species as a whole.

Plaintiffs argue that defining "harass" to include habitat modification would make the use of the term "harm" in the statutory definition of "take" a nullity. Congress "intended 'take' to apply broadly." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 704, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). " 'Take' is defined ... in the broadest possible manner to include every conceivable way in which a person can 'take' (harass) or attempt to 'take' any fish or wildlife." S.Rep. No. 93–307, 1973 U.S.C.C.A.N. 2989, 2995 (1973); H.R.Rep. No. 93–412, 11 (1973) (" 'Take' is defined broadly.").

Congress meant each term in the definition of "take" "to serve a particular function in the ESA, consistent with, but distinct from, the functions of the other verbs used to define 'take.' " *Sweet Home,* 515 U.S. at 702, 115 S.Ct. 2407. In defining "harm," the Supreme Court noted:

In contrast, if the statutory term "harm" encompasses such indirect means of killing and injuring wildlife as habitat modification, the other terms listed in § 3— "harass," "pursue," "hunt," "shoot," "wound," "kill," "trap," "capture," and "collect"—generally retain independent meanings. Most of those terms refer to deliberate actions more frequently than does "harm," and they therefore do not duplicate the sense of indirect causation that "harm" adds to the statute. In addition, most of the other words in the definition describe either actions from which habitat modification does not usually result (e.g., "pursue," "harass") or effects to which activities that modify habitat do not usually lead (e.g., "trap," "collect"). To the extent the Secretary's definition of "harm" may have applications that overlap with other words in the definition, that overlap reflects the broad purpose of the Act.

*Id.* at 698 n. 11, 115 S.Ct. 2407.

The use of the term "harass" in this situation does not make the term "harm" a nullity. "Harm" is "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102. Harassment on the other hand occurs when an act annoys fish to the point where they significantly modify their behavior. These definitions, while similar, are different. Although in certain circumstances the two definitions will overlap, mutual exclusivity of the terms defining "take" is not required. "To the extent the Secretary's definition of 'harm' may have applications that overlap with other words in the. definition, that overlap reflects the broad purpose of the Act." *Id.* at 698 n. 11,

115 S.Ct. 2407. A finding of "harassment" in this situation does not nullify "harm." Interior did not err.

### b. *Relation of RPM to "Take"*

Plaintiffs argue that the only incidental take found by NMFS was that related to gravel displacement and that Terms and Conditions 1.a. and 1.b. are not rationally related to reducing the take that would occur as a result. The first RPM in the NMFS incidental take statement requires Interior to "[i]mplement the flow regimes included in the proposed action (as described in TRMFR DEIS, page 2–19, Table 2–5) as soon as possible." AR 17492. To implement that RPM, Interior is directed to comply with three terms and conditions, the first two of which are in dispute here:

> 1.a. Following completion of the Record of Decision addressing the proposed action, Reclamation shall immediately implement the components of the proposed flow schedule (as described in the TRMFR DEIS, page 2–19, Table 2–5) equal to or less than 6,000 CFS, and implement the entire flow schedule as soon as possible (i.e., after infrastructure modifications are completed);
>
> 1.b. As necessary infrastructure modifications are made, Reclamation shall incrementally implement higher Trinity River flows (consistent with the proposed flow regime), e.g., potentially release up to 8,500 CFS after some bridge modifications, but prior to completion of the "Bucktail" and "Poker Bar" bridge replacements.

AR 17493.

An incidental take statement may specify RPMs that the agency "considers necessary or appropriate to minimize" the incidental taking of the species. 50 C.F.R. § 402.14(i)(1)(ii). Term and conditions that must be complied with in order to implement the RPMs must also be set out. 50 C.F.R. § 402.14(i)(1)(iv). RPMs are only required if they are necessary or appropriate to minimize incidental take.

Here the incidental take will result from "temporarily degraded [conditions] due to localized turbidity and potential fine sedimentation of channel substrate during construction activities." AR 17491. Plaintiffs argue that the first two terms and conditions do not address this harm.[47] In doing so they note that the biological assessment performed by Reclamation and USFWS found that increased flows would actually increase "turbidity." The biological assessment found "higher dam releases will produce a marked increase in sediment transport downstream resulting in increased turbidity levels due to scour." AR 18354. However, it also found that the "bench flows" in the Preferred Alternative would "promote[ ] transport of fine sediment." AR 18352. Although the prescribed terms and conditions may make one of the problems associated with channel rehabilitation worse, i.e., turbidity, they may improve sedimentation, the other problem identified in the incidental take statement. On matters of scientific expertise courts should defer to the agency's expertise. *Marsh*, 490 U.S. at 377, 109 S.Ct. 1851 ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.' ") (quoting *Kleppe v. Sierra*

---

47. Plaintiffs also argue that even if the increased flows would help mitigate the incidental take, the RPM is "wildly disproportionate to the minimal expected adverse impact of gravel placement." Doc. 239 at 33:2–3. This argument is not expanded upon nor do plaintiffs cite law explaining what they mean, i.e., whether the increased flows only address the incidental take or the overall Trinity River restoration objective.

*Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). NMFS's opinion is entitled to deference as to take resulting from gravel displacement.

### c. *Requiring Flow Increases as an RPM*

Plaintiffs object that the NMFS exceeded its authority by requiring, as an RPM, that the Preferred Alternatives' flows be implemented.[48] The purpose of consulting with the NMFS was to comply with Section 7 of the ESA which requires agencies to, "in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical, unless such agency has been granted an exemption. . . ." 16 U.S.C. § 1536(a)(2).

██ The disputed action is the implementation of the Preferred Alternative. Essentially what NMFS did was require that the Preferred Alternative be implemented to minimize the effects of implementing the Preferred Alternative. This is not a permitted function of a RPM. Incidental take statements are intended to determine if an agency's actions will jeopardize a listed species. The purpose of an RPM is not to require that an agency take the very action upon which consultation has been initiated. Moreover, the evidence in the record shows the Preferred Alternative was not necessary to mitigate the incidental take, which did not require

all the flow volumes or rehabilitation measures it recommends.

By requiring the Preferred Alternative be implemented to minimize the effects of implementing the Preferred Alternative, the NMFS exceeded its statutory authority. That increased flows and channel rehabilitation may mitigate the effects of the preferred alternative is circular. Even if the evidence does not support a finding that recommended habitat improvement will be lethal to juvenile coho salmon, the AR does find evidence of harassment which qualifies as take. Although this is not a ground on which to invalidate the disputed RPM, no deference is owed to NMFS's RPM that the Preferred Alternative be implemented. Plaintiffs' motion for summary adjudication to set aside the RPM in the NMFS BioOp requiring implementation of the Preferred Alternative's flows is GRANTED. The federal defendants' motion on the same issue is DENIED.

### D. *ADMINISTRATIVE PROCEDURES ACT*

Section 706 of the Administrative Procedures Act ("APA") directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *Ninilchik Traditional Council v. United States,* 227 F.3d 1186, 1193 (9th Cir.2000). This standard is deferential and is intended to "ensure that the agency considered all of the relevant factors and that its decision contained no 'clear error of judgment.'" *Pacific Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l*

---

**48.** The first RPM in the NMFS incidental take statement requires Interior to "[i]mplement the flow regimes included in the proposed

action (as described in TRMFR DEIS, page 2–19, Table 2–5) as soon as possible." AR 17492.

*Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir.2001) (quoting *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir.1987)). "Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Judicial review must be " 'searching and careful' but remains narrow as we are not to substitute our judgment for that of the agency's.' " *Ninilchik*, 227 F.3d at 1194 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989); *Ninilchik*, 227 F.3d at 1194.

■■■ Plaintiffs argue that Interior's decision to adopt the ROD was arbitrary and capricious because it locked in permanent instream flows for the Trinity River although the science upon which those flows were based is uncertain. They advance two primary contentions: 1) that the flows were impermissibly selected from an unnecessarily high range; and, 2) that the science underlying the decision was inherently uncertain because the ROD's analysis acknowledges that future effects cannot be determined and will require further study and response.

### 1. Selection of Flow Amounts Within a Range

The flow study ranges, which are variable by five water year types, ranging from critically dry to extremely wet, derived from a scientifically conducted study designed to ascertain what annual instream flow levels were likely to achieve Trinity River fishery restoration. That science could not pinpoint the exact minimum amount necessary, year by year, under constantly changing hydrologic conditions, does not make Interior's decision per se arbitrary and capricious. Courts are particularly deferential in scientific matters where the agency has expertise. *Ninilchik*, 227 F.3d at 1194. Interior's approach locks in permanent flows at a minimum annual flow level, without analysis of variable flows that utilize all available restorative means and without considering secondary CVP interests. The statute requires a permanent Trinity river restoration to approximate pre-TRD conditions. This is not a subject suited for second-guessing. However, Interior's choice of flow levels did not include a level of analysis that considered non-flow measures or secondary statutory objectives.

### 2. Uncertainty of the Underlying Science

Plaintiffs argue that the Secretary's decision was arbitrary and capricious because it locked in permanent fixed amounts of water that are to be released in each water year type, even though the science that purports to measure the necessity of those amounts was not certain.[49] Plaintiffs contend Appendices N and O to the TRFEFR show that the ROD is a "major experiment in fluvial geomorphology." Doc. 233 at 39:2 (SMUD Motion).

---

**49.** The federal defendants argue that the amounts are not "fixed" because they vary

Appendix N describes the Adaptive Environmental Assessment and Management ("AEAM") program. It recognizes that "alluvial river systems are complex and dynamic. There are not many unambiguous clear-cut answers to complex hydraulic, channel-structure, and water quality changes ..." and that "the information we base our decisions on is almost always incomplete." TRFEFR at N–2. Appendix O discusses the hypotheses used, potential competing hypotheses, management objectives, what is known specifically about the Trinity River, and the major unknown or unquantified issues that needed to be addressed. *Id.* at O–2. An agency decision is not arbitrary or capricious because the agency recognizes the limitations of the information upon which it bases a decision. The fact that Interior has acknowledged it will learn new facts in the future, that river flow management is dynamic, and climatic conditions, upon which CVP water supply depend, uncertain, are indicative of a reflective decisionmaking process, not arbitrariness.

The requirements of the 1984 Act and the CVPIA do not change this. They mandate restoration of the Trinity River to approximate pre-Trinity River Division fish and wildlife levels. The TRFES addresses a portion of the 1984 Act's broader objectives along with the specific objec-

tives of the CVPIA. CVPIA section 3406(b)(23) directs Interior to complete the TRFES by 1996 "in a manner which insures the development of recommendations, *based on the best available scientific data,* regarding *permanent instream fishery flow requirements* and the Trinity River Division operating criteria and procedures for the restoration and maintenance of the Trinity River fishery." (emphasis added). The CVPIA requires that the "best available scientific data" be used, not that Interior establish with scientific certainty the exact minimum amount of water permanently needed each year for enhanced instream fishery flows that will restore Trinity River Basin to pre-TRD conditions. The TRFEFR acknowledges that the best available scientific data is not exact. This does not make Interior's decision arbitrary and capricious.[50] To the contrary, the certainty Plaintiffs' seek could prevent the mandated statutory goal of flow restoration from ever being implemented.

Plaintiffs next argue that although it may be possible that a flow recommendation can be implemented "without precisely knowing what flows will, in fact, achieve what degree of morphological change .... the decision to cast such numbers in stone despite the high degree of uncertainty surrounding them and the explicit need for an

---

based on the type of water year. This is a red herring. The instream minimum flow increases required by the ROD are permanent. The fact that the amount varies based on water year type does not change this; i.e., in a normal water year the permanent increase is approximately 300,000 AF over the statutory 340,000 AF minimum and 475,000 AF more in an extremely wet year.

**50.** SMUD argues that the failure to set concrete goals results in the ROD being arbitrary and capricious. The ROD's goals are stated. It is not clear how the alleged failure to more

precisely define such goals makes the decision arbitrary and capricious. The ROD here determines the flow levels reasonably required for river and fishery restoration, based on the best scientific data now available. The possibility that new data in the future may prove the Secretary's decision wrong, does not make arbitrary and capricious the current decision which utilizes current known scientific data. Nor does the law prevent Interior from making a decision that is unwise or even mistaken.

extensive and detailed adaptive management plan to cover a huge array of contingent unknowns is arbitrary and capricious." Doc. 233 at 39:12–16. Instead, plaintiffs propose that the flows proceed "on a yearly basis to posit necessary flows, test these in accordance with the adaptive management plan and make necessary yearly adjustments." Doc. 286 at 13:8–10. They argue that Section (b)(23) does not require the Secretary to actually implement the permanent instream flows.

Section (b)(23) has two subsections. The first mandates that the TRFES be *completed* and that it make recommendations regarding *permanent* instream flows.[51] The second mandates that the recommendations be forwarded to Congress no later than December 31, 1996 and that if the Secretary and the Hoopa Valley Tribe concur, that those recommendations be implemented. The term "permanent" in the first section combined with the mandate that the recommendations actually be implemented upon the occurrence of finite events, forecloses plaintiffs' interpretation. Plaintiffs proposal that the instream flows for the Trinity River continue to be studied on a yearly basis and be changed, annually, based upon new information in perpetuity derogates the statute's use of the term "permanent." "Permanent" is defined as "existing perpetually; everlasting, especially without significant change" and "intended to exist or function for a long, indefinite period without regard to unforeseeable conditions." Random House Webster's, Unabridged Dictionary

1442 (1998). That the term "permanent" encompasses a variable flow regime, based on annual hydrological conditions, as pertains to Interior's actual management of annual CVP water allocations, is not necessarily inconsistent with the definition of "permanent."

The law mandates that the Trinity River and fishery must now be restored with CVP water flows. Congress has required that Trinity River water be the source of the restoration. It has not provided a replacement source of that water for the CVP. That such restoration will likely create CVP water shortages that will deprive other CVP users has not been addressed by Congress, except for general reference in the CVPIA to balance needs of other CVP water users. § 3402(f). Ultimately, Interior annually uses complex quantitative water management methods to accommodate the large number of variables it faces in annually allocating CVP water among environmental, municipal, industrial, agricultural, and power generating uses. The flow levels selected are not arbitrary or capricious as a matter of law; however, they were not selected from a reasonable range of alternatives.

Plaintiff's motion for summary judgment based on the arbitrariness, capriciousness, or unlawfulness of the recommended flows in the ROD is DENIED. The federal defendants' and the Hoopa Valley Tribe's motions on the same issue are provisionally GRANTED, subject to an SEIS which takes a hard look at a flow restoration plan

**51.** In setting out Section (b)(23) in its reply brief, SMUD seizes upon the term "regarding:" "[B]y September 30, 1996, the Secretary ... shall complete the Trinity River Flow Evaluation Study ... in a manner which ensures the development of recommendations, based on the best available scientific data, *regarding* permanent instream fishery flow requirements...." Doc. 286 at 3–6. SMUD's emphasis is unclear. Presumably it means that Interior could have recommended no permanent instream flows, and instead continue to study restoration indefinitely with variable flows adjusted each year based upon new information. This is inconsistent with the statute's use of the term "permanent."

which considers non-flow and secondary statutory objectives.

## E. *REMEDY*

Defendants argue that if NEPA violations are found, the court should exercise its judicial and equitable discretion and allow the ROD to be implemented or at least allow the non-flow measures of the ROD to continue as they have under the preliminary injunctions. Plaintiffs argue that the ROD should be set aside in accordance with Section 706 of the APA.

■■■ APA Section 706 provides: "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Despite the mandatory language, "shall," courts retain equitable discretion to fashion appropriate remedies when there has been a violation of NEPA. *See Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 541–45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir.2001).

■■■ To determine whether injunctive relief is appropriate, the traditional balance of harms analysis is applied. *Nat'l Parks & Conservation*, 241 F.3d at 737. The court should consider whether there will be irreparable injury and whether there are other adequate legal remedies. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). However, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396. "When the 'proposed project

may significantly degrade some human environmental factor,' injunctive relief is appropriate." *Nat'l Parks & Conservation*, 241 F.3d at 737 (quoting *Alaska Wilderness Recreation & Tourism Assoc. v. Morrison*, 67 F.3d 723, 732 (9th Cir.1995)).

■■■ A violation of NEPA is an environmental harm. *Sierra Club v. Marsh*, 872 F.2d 497, 500–04 (1st Cir.1989) ("Congress, in enacting NEPA, explicitly took note of one way in which governments can harm the environment (through inadequately informed decisionmaking); ... courts should take account of this harm and its potentially 'irreparable' nature."). "[T]he harm at stake in a NEPA violation *is* a harm to the *environment*, not merely to a legalistic 'procedure,' nor, for that matter, merely to psychological well-being.... [T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation." *Id.* at 504 (emphasis in original).

■■■ The current dispute is unusual in that environmental concerns are on both sides of the balance of hardships. On one side, the federal defendants, in seeking to restore the Trinity River fishery, failed: 1) to adequately analyze the impact of likely major CVP reoperation associated with the X2 standard on the Sacramento River and Delta ESA-listed species; 2) to consider the impacts of Trinity Dam outlet bypass on Northern California hydroelectric power supply and reliability; 3) to adequately analyze the Preferred Alternative's ability to impact on Northern California hydroelectric power supply; and, 4) to fully consider an Integrated Management Alternative. NEPA's purpose is to ensure decisions made by federal agencies include such analysis to reduce the likeli-

hood a bad decision is made. On the other hand, restoration of the Trinity River fishery, and the ESA-listed species that inhabit it, are to remedy real and continuing environmental harm, and are unlawfully long overdue. The chronic delays by Interior in discharging its express statutory duties in managing the CVP, and its riverine components, have unjustifiably thwarted these Congressional objectives. *See generally, Firebaugh Canal Co. v. United States,* 203 F.3d 568, 577–78 (9th Cir.2000).

Contrary to Plaintiffs' assertion of irrelevancy, the government is also in breach of its general and specific (§ 3406(b)(23)) independent federal trust obligation to the Hoopa and Yurok Tribes. Congress mandated that restoration of the Trinity River begin no later than 1996, in part to discharge the federal government's trust responsibility to the Tribes, a deadline six years past. In addition to harm caused by delay, "[T]he harm at stake is a harm to the *environment,* but the harm consists of the added *risk* to the environment that takes place when governmental decision-makers make up their minds without having before them an analysis (with proper public comment) of the likely effects of their decision upon the environment." *Sierra Club,* 872 F.2d at 500 (emphasis in original). The balance of equities favors continuing to restore the Trinity River fishery.

Congress here provided a fail–safe mechanism of a minimum flow regime. The undisputed evidence establishes that the 340,000 AF annual flows are not sufficient in all types of water years to restore the Trinity River fishery. To further delay implementation of (b)(23) for another indefinite period of time while Interior

"tries to get it right" is an inadequate remedy which will result in irreparable injury.

Considering the totality of all factors, the balance of hardships weighs heavily against enjoining the non-flow measures in the ROD and the implementation of the ROD's critically dry and dry year flows,[52] in view of expert testimony that less than 368,000 AF of annual flows actually jeopardizes the Trinity River fishery. Despite all the Plaintiffs' legitimate concerns, Congress has mandated the Trinity River and its fishery must be restored without further delay. This overriding mandate comes from Congress and it is to Congress Plaintiffs must address their concerns about any unfairness in the reallocation of the Trinity River flows to the Trinity River Basin and away from other CVP uses. It is unacceptable that Interior's failures be the catalyst to impose harm on all the competing interests. Such prioritization of federal water use for the Trinity River is the province of the executive and legislature, not the judiciary.

After full analysis, it is likely that the infirmities in the environmental scoping and review processes can be cured by an SEIS. The Sacramento River and Delta ESA-listed species are not harmed by immediately implementing the ROD's non-flow measures and permitting use of critically dry and dry year flows provided by the ROD. Any harm to the NEPA decisionmaking process by allowing these measures to go forward is overwhelmingly offset by the benefit to the Trinity River fishery and need to discharge the federal trust obligation owed to the Indian Tribes.

However, the balance of the hardships does favor enjoining the implementation of

---

**52.** At oral argument the federal defendants stated that the NMFS' incidental take statement is only valid if the flows are implemented.

the ROD's permanent recommended flows above the 452,600 AF level, pending full compliance with NEPA and the ESA. There are ESA-listed species on both sides of the balance and other impacts on CVP water users which have not been properly subjected to a "hard look." NEPA's purpose is to prevent the agency from making a decision that it will later regret. The bureaucratic tendency to chose an option simply because it has already been implemented is a harm to the environment that is real. Congress has set the minimum release of 340,000 AF/year of water as a fail-safe to prevent further degradation of the Trinity River pending Interior's lawful completion of scientific study of the issues. Congress' finding deserves deference.[53] The court has no inclination to, nor should it, substitute its judgment to decide the permanent increase in the amount of CVP water that should flow into the Trinity River.[54] This would result in judicial micro-management of the Trinity River restoration. The restoration decision was made by Congress, to be implemented by Interior, not the Court.[55]

Congress has expressed its unequivocal concern in the 1984 and 1996 Acts, as implemented by CVPIA § 3406(b)(23), is

**53.** Plaintiffs argue that Section (b)(23) "forecloses" the exercise of equitable discretion without lawful concurrence based on the section's provision that "[i]f the Hoopa Valley Tribe and the Secretary do not concur, the minimum Trinity River instream fishery releases ... shall remain in effect unless increased by an Act of Congress, appropriate judicial decree, or agreement between the Secretary and the Hoopa Valley Tribe." While Congress may control the exercise of a court's discretion, the congressional mandate must be fairly explicit. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco,* 480 U.S. at 542, 107 S.Ct. 1396. "Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles." *Romero–Barcelo,* 456 U.S. at 313, 102 S.Ct. 1798.

> [T]he comprehensiveness of this equitable discretion is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.

*Id.* (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)).

Given the purpose of Section (b)(23) is to restore the Trinity River fishery and to meet the federal government's trust obligations to the Hoopa Valley Tribe, and the fact that Section (b)(23) states that 340,000 AF is the "minimum" instream fishery flows required under the statute, the fair inference is that Congress meant to limit the court's discretion in lowering the amount of water dedicated to instream fishery flows below 340,000 AF. There is no "necessary and inescapable inference" that Section (b)(23) limits the court's discretion to craft equitable relief in excess of that amount. However, Congress' findings do provide guidance.

**54.** The Hoopa Valley Tribe argues, relying on various declarations, that the minimum amount of water necessary is 368,600 AF. This opinion draws upon hydrology, geomorphology, and ecology. A court cannot usurp the province of the executive. Congress determined that the minimum amount necessary is 340,000 AF/year. That minimum flow must be provided to the Trinity River. .

**55.** The Hoopa Valley Tribe also argues the preliminary injunction decisions found that certain flow releases under the ROD have been demonstrated to impose no harm on plaintiffs. That is not the finding of those decisions. The preliminary injunction decisions balanced current hardships and determined certain annual water releases were justified under the totality of circumstances premised on then-existing hydrological conditions.

about fulfilling the federal government's trust obligation to the Indian Tribes. The federal defendants' failure to meet the deadlines set out by Congress in the CVPIA defeats this purpose. Continued delay only exacerbates the harm. In completing an SEIS the federal defendants must expedite their review and conclude the process within one hundred twenty (120) days following this decision. The federal defendants have studied the Trinity River restoration issue for over twenty years. The process must now be immediately completed in compliance with federal law.

## V. CONCLUSION

When the EIS scoping to define the purpose for the TRFES began, the Tribes participated and their lawyer stood by while the County of Trinity persuaded the EIS management team to unfairly and unlawfully narrow the purpose and scope of the EIS. Such action seeking to limit informed decision-making for the sale of expediency, has no place in the NEPA process which invests government lawyers and representatives with the legal responsibility to carry out NEPA's public objectives to ensure that a hard look is taken at all reasonable alternatives to proposed major federal action, which will have undeniable consequences, to enable the Agency to make an informed decision with informed public participation. Here, an intentional subversion of NEPA's requirements prevented full and fair consideration of significant impacts which will be caused by CVP reoperations. A reasonable Integrated Management alternative, which would utilize non-flow measures and seek to minimize impacts on all other CVP interests, while achieving the statutory goal of Trinity River fishery and basin restoration, was not fairly considered. Inadequate consideration was given to power supply and reliability impacts in a changing hydropower environment. The public had no participation in any NEPA process leading to the ROD, after the DEIS public comment period closed. BioOp RPMs for salinity control and temperature regulation that constitute major action were improperly adopted.

Abrogation of the full and free investigation and consideration of all reasonable alternatives has resulted in an administrative record that severely limits the Court's ability to conduct a fully informed analysis of all the merits of Plaintiffs' NEPA claims. Specifically, that significant CVP reoperation adverse impacts were not considered; an Integrated Management Alternative was not properly considered or fairly analyzed; and that the Preferred Alternative ignores the best available science. Some of the NEPA procedures followed impaired, rather than advanced, public participation and informed decision-making. They also caused substantial post-ROD and extra-record information to be submitted as a direct result of the inappropriately narrow scope of the EIS. The defenders of the EIS and ROD contend plaintiffs did not timely present information, although the narrow definition of the EIS's purpose was the ultimate excuse for Interior not performing the analysis. They now criticize the Hanson opinions as bad science, yet there was no public discussion or NEPA review of such management measures, because the flow recommendations were made without benefit of Dr. Hanson's scientific calculations and measures to achieve secondary objectives. The agencies and EIS management team intentionally narrowed the EIS purposes to "ecological" and "flow-driven" objectives which avoided addressing, and foreclosed

public participation, on any alternative that sought to utilize non-flow measures to minimize species and other CVP-wide adverse impacts without compromising the Trinity River fishery and basin restoration.

Although Interior cannot be forced to adopt an Integrated Management alternative, such a reasonable alternative was entitled to a hard look on its merits. There is no explanation for the failures of the NEPA process that occurred in this case, except that public participation had been concluded when the hard questions were raised and dismissed by Interior as insignificant. The NEPA process must be lawfully completed by a supplemental EIS.

## ORDERS

The Hoopa Valley Tribe's motion for summary judgment on the issue of NEPA's applicability to this case as irreconcilably inconsistent with § 3406(b)(13) and related statutes is DENIED.

Plaintiffs' motion for summary adjudication on the issue of the federal defendants' failure to comply with NEPA based on inadequate assessment of impacts of the Preferred Alternative on Sacramento River and Delta ESA-listed species which will be caused by CVP reoperation is GRANTED.

Plaintiffs' motion for summary judgment on the issue of the federal defendants' failure to comply with NEPA based on a lack of analysis of the Lewiston Dam alternate bypass RPM is GRANTED. Opposing motions on the same issue are DENIED.

Plaintiffs' motion for summary adjudication on the issue of the federal defendants' failure to comply with NEPA in their analysis of the X2 RPM is GRANTED. The federal defendants' motion on the same issue is DENIED.

Plaintiffs' motion for summary judgment on the issue of federal defendants' failure to comply with NEPA based on analysis of the Preferred Alternative's effect on power system reliability is GRANTED. The federal defendants' motion on the same issue is DENIED.

Plaintiffs' motion for summary judgment on the issue of federal defendants' failure to comply with NEPA based on the timing of the EIS is GRANTED IN PART.

Plaintiffs' motion for summary judgment on the issue of the federal defendants' failure to comply with NEPA based on the range of alternatives considered is GRANTED.

Plaintiffs' motion to set aside the X2 RPM in the USFWS BioOp as major action is GRANTED. The federal defendants' motion on the same issue is DENIED. Plaintiffs' motion to set aside the NMFS BioOp RPM requiring immediate implementation of the Preferred Alternative is GRANTED. Federal defendants' motion on the same issue is DENIED. Plaintiffs' motion to set aside the NMFS BioOp because it failed to identify lethal harm to species is DENIED. Federal defendants' motion on the same issue is GRANTED.

Plaintiffs' motion to set aside the ROD because it is arbitrary and capricious is DENIED.

Having balanced the hardships, and to avoid irreparable injury, implementation of ROD flows in years except dry or critically dry years, not to exceed 452,600 AF, is ENJOINED until the federal defendants complete an SEIS in compliance with NEPA and this decision.

All non-flow measures prescribed by the ROD shall proceed and plaintiffs' request for an injunction against such ROD measures is DENIED.

The federal government has a trust obligation to the Hoopa and Yurok Indian Tribes and Congress expressed its intent this obligation be finally fulfilled more than four years ago. The federal defendants must proceed immediately to complete the NEPA process. The court retains jurisdiction over this controversy to enforce the orders prescribed. The federal defendants shall complete the SEIS on the issued designated within one hundred twenty (120) days following date of service of this decision.

SO ORDERED.